Gary KNOP, John Ford, William Lovett, II, Ramando Valeroso, Gus Jansson, Pat Sommerville, Vernard Cohen, T. Jon Spytma, Robert Shipp, Butch Davis, Ron Mixon, and Kerwin Cook, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Perry M. JOHNSON, Robert Brown, Jr., Dale Foltz, John Jabe, Theodore Koehler, John Prelesnik, and Jack Bergman, Defendants.

No. G84–651.

United States District Court,
W.D. Michigan, S.D.

Aug. 10, 1987.

See also 667 F.Supp. 512.

468

Elizabeth Alexander, Adjoa Aiyetoro & Nkechi Taifa-Caldwell National Prison Project, Washington, D.C., Patricia Streeter, Detroit, Mich., for plaintiffs.

Thomas Nelson, Brian McKenzie, David Edick, Michigan Office of the Atty. Gen., Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This is a prison case that concerns conditions of confinement at four major prisons in the Michigan system. It is a class action proceeding in which the plaintiff class is composed of all prisoners who are or will be confined by the Michigan Department of Corrections at the State Prison of Southern Michigan ("SPSM"), located in Jackson, Michigan; the Michigan Reformatory ("MR"), located in Ionia, Michigan; the Riverside Correctional Facility ("RCF"), also located in Ionia, Michigan; and the Marquette Branch Prison ("MBP") (including the former Michigan Intensive Programming Center ("MIPC"), which now is designated as A–Block of the MBP), located in Marquette, Michigan.

The defendants in the case are the Director of the Michigan Department of Corrections ("MDOC"), who now is Robert Brown, Jr.; the Deputy Director of the MDOC and the Director of the Bureau of Correctional Facilities, who now is Daniel Bolden; the Warden of the State Prison of Southern Michigan, who currently is John Jabe and who for most of the relevant time period was Dale Foltz; the Warden of the Michigan Reformatory, who currently is Pamela Withrow and who for most of the relevant time period was John Jabe; the Administrator of the Reception and Guidance Center, John Prelesnik; the Warden of the Marquette Branch Prison, Theodore Koehler; and the Warden of the Riverside

Correctional Facility, who currently is Denise Quarles and who for part of the relevant time period was William Abshirer. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, new defendants automatically have been substituted for original defendants as they have succeeded them in office. The Court notes here that although Jack Bergman was named as a defendant in his former capacity as the Administrator of the MIPC, he effectively has been dropped from the action because the MIPC has been converted into A–Block of the MBP, under the control of Warden Koehler.

In their first amended complaint, filed on April 16, 1985, plaintiffs raised numerous grounds for relief against defendants. On March 20, 1986 the Court severed the following four issues for immediate trial: (1) whether the lack of toilets and washbasins in certain locked cells at the RCF violates plaintiffs' Eighth Amendment right not to be subjected to cruel and unusual punishment; (2) whether defendants' alleged failure to provide plaintiffs with proper winter clothing also violates their Eighth Amendment right not to be subjected to cruel and unusual punishment; (3) whether defendants engage in racially discriminatory actions concerning job assignments, cafeteria serving lines, and the placement of inmates in administrative segregation, punitive detention, and protective custody in violation of plaintiffs' Fourteenth Amendment right to the equal protection of the law; and (4) whether defendants are unlawfully· interfering with plaintiffs' constitutional right of access to federal and state court systems. This last issue includes the issue of whether defendants' system for handling inmates' incoming legal mail is constitutional. On May 14, 1986 the Court declined to sever for immediate trial plaintiffs' claim that defendants are not providing them with constitutionally adequate mental health care because it has conducted numerous hearings on that issue in connection with the Consent Decree entered in the related case of *United States v. Michigan*, No. G84–63 (W.D.Mich.).

After numerous pretrial motions, hearings, and other skirmishes between the parties, many of which Magistrate Rowland handled, the Court conducted a thirty-five day bench trial on the severed issues that was spread over five months: June 1986, August 1986, October 1986, March 1987, and April 1987. During the trial it listened to testimony from 103 witnesses—seventy-eight for the plaintiffs and twenty-five for the defendants—and received hundreds of exhibits into evidence. There remain some unresolved evidentiary motions that I will decide when I discuss the substantive issue to which the evidence pertains. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the following opinion constitutes the Court's findings of fact and conclusions of law on the severed issues.

### Introduction to the Case

The prisoners who have brought this action are confined in Michigan's oldest and largest prisons. The Marquette Branch Prison, which is located in Michigan's Upper Peninsula, far away from the State's major population centers, is both a maximum security and a minimum security facility. The maximum security inmates are housed inside the walls of the prison. The inside prison has a rated capacity of 606 inmates, which is broken down into three groups: 249 administrative segregation cells; 262 cells for inmates in the general population group; and 95 protective custody cells. The administrative segregation units of the prison house the system's most difficult to manage inmates and is predominately black. Pls. Exh. 510B. The prison also has a trustee division, which houses the minimum security inmates and currently is predominately white. Pls. Exh. 521A. The staff of the institution is overwhelmingly white. Pls.Exh. 521Q; Transcript ("T") of 3–16–87 at 12. The protective custody unit, which used to be the MIPC, also is predominately white, although it is more evenly divided between black inmates and white inmates than the rest of the institution. T of 3–17–87 at 93.

The systems' largest facility is the State Prison of Southern Michigan, which is located in Michigan's Lower Peninsula near the major population centers of Lansing,

Grand Rapids, and Detroit. The SPSM currently is composed of three complexes: the central complex, the south complex, and the north complex. The central complex houses close custody inmates, which is the security level just below maximum security, and includes inmates confined to administrative segregation and protective custody. Inmates confined in the central complex are involved in this case only on the racial discrimination claim. The north complex is a medium security facility, while the south complex is a minimum security facility. The inmates confined in the central complex are overwhelmingly black; the racial compositions of the south and north complexes are more evenly divided between black inmates and white inmates.

The Michigan Reformatory and the Riverside Correctional Facility also are located in Michigan's Lower Peninsula. The MR houses both minimum security and close custody inmates. The minimum security inmates are housed in the institution's trustee division. The close custody inmates are housed inside the walls of the institution, are primarily if not exclusively under the age of twenty-five, and are predominately black. The RCF is located near the Reformatory and contains four housing groups that are relevant to this case: protective custody, administrative segregation, general population, and inmates going through reception or quarantine. Some of the cells in this institution do not have a toilet or washbasin inside the cell. Located in the same group of buildings as the RCF is the Riverside Psychiatric Center ("RPC"), which also contains some cells that do not have a toilet or washbasin within the cell.

The Court will divide its discussion of the severed issues into five parts: (1) legal mail; (2) lack of adequate winter clothing; (3) lack of in-cell toilets and washbasins at the RCF and the RPC; (4) access to courts; and (5) racial discrimination. Following my discussion of the substantive issues, I will briefly discuss for the benefit of the parties the appealability under rule 54(b) and 28 U.S.C. § 1292 of my judgments on those issues. Since plaintiffs'

claims generally implicate different constitutional provisions, I will discuss the applicable legal standards in connection with each substantive claim rather than in a general discussion at this point in the opinion. The Court does observe that one overriding standard it has considered and applied throughout this opinion is the substantial deference it must give state prison officials, who have the difficult task of determining how to run their institutions. *See Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Due to considerations of comity and federalism, a federal court should hesitate to interfere in the operation of state prison systems, and should do so only when necessary to protect the constitutional rights of inmates. *See Kendrick v. Bland*, 740 F.2d 432, 437–39 (6th Cir.1984). If a constitutional violation does exist, however, then it unquestionably is the Court's duty to remedy it. *See Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981).

### Rulings on the Severed Issues

### I. Plaintiffs' Legal Mail Claim

The Court will divide its discussion of plaintiffs' legal mail claim into three parts. First, I will discuss the applicable legal standards. Secondly, I will discuss defendant's system of providing privileged treatment for inmates' incoming legal mail. Finally, I will discuss whether defendants' system is unconstitutional in any respect.

Inmates retain "all first amendment [and other constitutional] rights not incompatible with their status as prisoners, 'or with the legitimate penological objectives of the corrections system.'" *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir.1985), *quoting in part Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). The Supreme Court has recognized that in the context of incoming inmate correspondence, a penal institution's legitimate security needs justify certain measures that may infringe on inmates' First Amendment and Sixth Amendment rights, as well as their right of access to the courts. *See Procunier v. Martinez*, 416

U.S. 396, 412–413, 94 S.Ct. 1800, 1810–1811, 40 L.Ed.2d 224 (1974). These measures, as with other measures affecting inmates' constitutional rights, are valid if they are "reasonably related" to the institution's security needs or other "legitimate penological interests". *Turner v. Safley*, — U.S. —, —, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64, 79 (1987). In evaluating whether a particular measure satisfies this standard, a court must examine whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; whether "the governmental objective [is] ... a legitimate and neutral one"; whether "alternative means of exercising the right ... remain open to prison inmates"; the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and whether there are any ready alternatives to the challenged regulation. *Id.* — U.S. —, 107 S.Ct. at 2261–62, 96 L.Ed.2d at 79–80. In the legal mail context, prison officials bear the burden of putting "forth legitimate reasons for interfering with a prisoner's incoming mail." *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir.1986).

The Supreme Court has held that prison officials may open legal mail sent to inmates and inspect it for the presence of contraband, although they cannot read the mail. *Wolff v. McDonald*, 418 U.S. 539, 574–77, 94 S.Ct. 2963, 2983–85, 41 L.Ed.2d 935 (1974). The Supreme Court indicated in *Wolff*, however, and several courts have explicitly held, that an inmate has the right to be present when prison officials open his legal mail and inspect it for contraband. *Id.* at 577, 94 S.Ct. at 2985; *see, e.g., Taylor v. Sterrett*, 532 F.2d 462, 475 (5th Cir. 1976); *see also Parrish*, 800 F.2d at 604 (citing cases). Employing the standard established in *Turner*, it is fair to say that the Supreme Court has already determined that a prison regulation that allows officials to open and to inspect an inmates' incoming legal mail for contraband is reasonably related to a legitimate penological interest and thus is constitutionally valid, particularly if the inmate is allowed to be present during the inspection process. *See id.* at 603–04. The real issue in this case, thus, is whether there is anything about Michigan's system in particular that is unconstitutional.

Michigan's system for treating legal mail as privileged, meaning that plaintiffs have the right to be present when the mail is opened and inspected for contraband, is contained in two administrative rules and a policy directive. Administrative Rule 791.6603(4) provides that "[p]ursuant to a specific written request by a resident, mail which is clearly identified as coming from the resident's designated attorney or the corrections ombudsman shall be opened and inspected for contraband in the resident's presence." This rule clearly requires the inmate to invoke his right to be present when mail coming from his attorney, whom he must designate in advance, or from the corrections ombudsman is inspected for contraband. The second Administrative Rule, rule 791.6615(2), apparently supplements rule 791.6603(4) by providing that in addition to mail from an inmate's designated attorney and from the corrections ombudsman, prison officials shall treat as confidential mail communications between inmates and courts, public officials, the director of the Department of Corrections, and the corrections commission. Finally, Policy Directive PD–BCF–63.03 provides in pertinent part that "[u]pon written request by a prisoner to the institution's mail room supervisor, mail which is clearly designated as being from the prisoner's designated attorney, the courts, or from the Legislative Corrections Ombudsman, shall be opened and inspected for contraband in the prisoner's presence." This policy directive is similar to rule 791.6603(4), except that it clarifies that an inmate must send his request for confidential treatment to the mail room supervisor for his institution and it encompasses mail from a court as well as mail from an attorney and the corrections ombudsman.

As the policy directive indicates, inmates must renew their request for confidential treatment of their legal mail each time they are transferred to a new institution. Pls.

exh. 404–A at 12; *cf.* T. at 3131–33. The testimony at trial also indicated that each institution has a different method for handling privileged legal mail. At the SPSM and the MBP, once an inmate has notified the mailroom that he has an attorney, the mailroom makes a notation that any mail the inmate receives that is clearly marked as coming from an attorney (not necessarily the inmate's designated attorney), a court, or the corrections ombudsman is to be treated as privileged mail. T at 530. The MR employs a different system, however, under which mail from a court or the corrections ombudsman is automatically treated as privileged, but mail from an attorney is not treated as privileged unless the inmate specifically designates the attorney. *Id.* at 530–31; pls. exhs. 155 (grievance response) & 496 at 1.

The privileged mail policy, including the institutions differing interpretations of it, is not, moreover, adequately explained to the inmates. The resident guidebooks for the various institutions do not contain a clear and correct explanation of the policy. The guidebook for the SPSM–North Complex, pls. exh. 404–C, in fact contains no discussion of the policy, while the guidebook for the MBP is misleading in that it does not inform inmates they must take action to have their legal mail treated as a privileged communication. During the orientation process the inmates are given a general guidebook to read that does explain the privileged mail policy, and the policy is explained to them orally as well at that time. Pls. exh. 404–A at 12; 3–18–87 T at 24. An inmate is not allowed to keep this guidebook, however, and upon his arrival at an institution he is given that institution's guidebook. Copies of the general guidebook are not, moreover, readily available for inmates to read. Finally, on occasion inmates who have requested privileged treatment for their legal mail find that their mail has been opened and inspected outside of their presence, although the Court is convinced that these openings are rarely, if ever, intentional.

Plaintiffs raise essentially three claims against defendants' legal mail policy. First, they argue that the policy improperly requires the inmates to invoke their right to be present when their legal mail is opened and inspected for contraband. Secondly, they argue that the institutions differing interpretations and applications of the privileged mail policy creates confusion among the inmates. Finally, they argue that many inmates are not aware of the policy. They request the Court to invalidate the requirement that inmates must request privileged status for their legal mail.

■ The Court agrees that certain aspects of defendants' legal mail policy, both as it is written and as it is implemented, violate the inmates' constitutional right to be present when prison officials open their legal mail and inspect it for contraband. I do not find that defendants' policy unconstitutionally shifts to the inmates the burden of invoking this right. I agree that defendants bear the burden of putting forth legitimate reasons for their policy. The Supreme Court, though, already has sanctioned the "policy" of inspecting legal mail for contraband. The issue here is defendants' method of implementing the inmates' right to be present when that inspection occurs, *i.e.,* whether inmates should be required to opt-in to the system or be considered "in" the system and allowed to opt-out of it. The Court believes that this is the kind of decision that courts generally should leave to the discretion of prison officials. Plaintiffs have produced no evidence that defendants' decision to place the burden on the inmates by itself infringes on their First or Sixth Amendment rights or their right of access to the courts. *Compare Guajardo v. Estelle,* 432 F.Supp. 1373, 1381 (S.D.Tex.1977) (court found no legitimate basis for a "requirement that inmates specially request that inspection of incoming attorney mail take place only in their presence") *aff'd in part and rev'd in part,* 580 F.2d 748 (5th Cir. 1978). The Court thus sees no basis for invalidating that requirement, even though I agree with plaintiffs that the reasons for this policy are at best obscure. See 3–17–87 T at 60–61. Plaintiffs simply have not supported their claim that the present sys-

tem unduly increases the possibility that an inmate will erroneously be denied privileged treatment of his legal mail. At best, plaintiffs have established that isolated incidents of error occur in a system that handles thousands of pieces of mail. See 3–23–87 T at 59.

If defendants are going to use such a policy, however, they must implement it in a manner that will allow inmates a full and informed opportunity to invoke their right to be present when their legal mail is opened and inspected for contraband. I find that the way in which defendants presently administer their opt-in system does not achieve that goal. As the Court already has discussed, the guidebooks given to the inmates at the subject facilities do not adequately explain the system. The Court cannot, moreover, accept defendants' contentions that inmates fully understand the system. There is no evidence that the general inmate guidebook, which does explain the system, is routinely available to the inmates; I cannot place much credence on the testimony of high level officials, such as Director Brown, who testified they did not know of any inmate confusion regarding the policy because such individuals are not in daily contact with the inmates; and plaintiffs produced evidence of confusion among both inmates and staff. *See, e.g.,* T at 1526–27; pls. exh. 169 (staff misstating the policy at MBP). Although the evidence on this point is not overwhelming, the Court finds it sufficient to establish that defendants' method of implementing their opt-in system unduly infringes on the inmates' right to be present when their legal mail is opened and inspected for contraband.

█ In particular, the Court finds that there are three unconstitutional flaws in defendants' system. First, each institution implements the policy differently, and the differences are not adequately explained to the inmates. Indeed, even Director Brown did not know there are differences between the institutions. 3–18–87 T at 25. Second, an inmate must renew his request whenever he is transferred to a new institution. Given the number of transfers which the

Court heard testimony on at trial, it finds that this requirement unduly infringes on the inmates' right to be present when their legal mail is opened and inspected. Finally, and most importantly, the requirement that an inmate specifically designate an attorney, at least as it is implemented at the Reformatory, can cause inmates unintentionally to waive this right. This situation can arise in two contexts. First, whenever an inmate is appointed an attorney in a case there is a chance that defendants will inspect the initial communication from that attorney to the inmate for contraband outside of the inmate's presence because the inmate will have been unable to notify the mailroom of the attorney's existence and identity. Secondly, in a class-action context, where one attorney or set of attorneys represent a number of inmates, the inmates similarly may be unable to invoke their right to be present when their legal mail is opened and inspected.

The Court accordingly will grant plaintiffs partial relief on this issue, and will require defendants to submit a revised system for allowing inmates to invoke their right to be present when their clearly marked legal mail, *i.e.,* mail from attorneys, the courts, and the corrections ombudsman, is opened and inspected for contraband that will remedy these constitutional defects. Defendants' submission will be due sixty (60) days from the date of this opinion. Plaintiffs will have thirty (30) days to respond to the submission. The Court thereafter will issue a final judgment on the issue.

To provide some guidance for defendants, the Court observes that the revised system should contain the following features. First, it should cover mail from an inmate's attorney, from a court, and from the corrections ombudsman. *See Taylor,* 532 F.2d at 475. Secondly, the policy should be uniform throughout the subject institutions. Thirdly, an inmate should not be required to renew his request for privileged treatment whenever he is transferred. An inmate should be given the choice during the orientation process of receiving privileged treatment for his clearly marked legal mail, and if he exercises his right to

be present when the mail is inspected he should maintain that right whenever he is transferred among the subject institutions unless and until he decides to revoke his request. Fourthly, an inmate should not be required to designate a specific attorney, but rather only to state whether he wants privileged treatment for his legal mail. The requirement in rule 791.6603(4) that the mail be clearly identified as legal mail adequately informs prison officials that it may require special handling. *See Harrod v. Halford*, 773 F.2d 234 (8th Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2254, 90 L.Ed.2d 699 (1986). The Court believes that the SPSM's system for handling privileged mail, under which no specific attorney is designated but an inmate rather is simply marked as wanting privileged treatment for his legal mail, adequately protects the inmates' constitutional rights in this respect. See 3–23–87 T at 57–59 (testimony of Thomas Phillips). Finally, the Court recognizes plaintiffs' contention that on occasion their legal mail is read. I find no evidence that these incidents, if they occur at all, are widespread, however, and thus will grant plaintiffs no relief on that issue.

### II. *Plaintiffs' Winter Clothing Claim*

Plaintiffs claim that defendants do not provide them with clothing that is adequate for Michigan winters. First Amended Complaint ¶ 47. The Eighth Amendment, which applies to the states through the Fourteenth Amendment, proscribes the infliction of cruel and unusual punishment. The Supreme Court has interpreted these words " 'in a flexible and dynamic manner' ", drawing upon objective criteria that reflect " 'the evolving standards of decency that mark the progress of a maturing society.' " *Rhodes*, 452 U.S. at 345–46, 101 S.Ct. at 2398–99 (citations omitted). Under the Eighth Amendment, a State may not incarcerate inmates under conditions that "involve the wanton and unnecessary infliction of pain," which includes "inflictions of pain ... that are 'totally without penological justification' ", or under conditions that are "grossly disproportionate to the severity of the crime warranting imprisonment."

*Id.* at 346–47, 101 S.Ct. at 2399 (citations omitted). In particular, conditions can be cruel and unusual if, considered alone or in combination, they "deprive inmates of the minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399; *Walker v. Mintzes*, 771 F.2d 920 (6th Cir.1985).

Several courts, including the Sixth Circuit, have stated that adequate clothing is one of the necessities of life of which State prison officials cannot deprive an inmate. *E.g., Bellamy v. Bradley*, 729 F.2d 416, 419 (6th Cir.1984), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1985); *Toussaint v. McCarthy*, 597 F.Supp. 1388, 1410–11 (N.D.Cal.1984); *aff'd in part, rev'd in part, vacated in part, and remanded*, 801 F.2d 1080 (9th Cir. 1986). An inmate is not entitled to the clothing of his choice, and prison officials do not violate the Constitution simply because the clothing they provide may not be aesthetically pleasing or may be illfitting. *See Williams v. Duckworth*, 598 F.Supp. 9, 16 (N.D.Ind.1983), *aff'd mem.*, 749 F.2d 34 (7th Cir.1984); *Wolfish v. Levi*, 573 F.2d 118, 132–33 (2d Cir.1978), *rev'd and remanded on other grounds sub nom., Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). States must, however, provide inmates with clothing that is at least minimally adequate for the conditions under which they are confined. Prison officials thus violate the Constitution if they provide inmates with clothing that is "patently insufficient to protect [them] from the cold in the winter months." *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558, 1575 (D.Idaho 1984). Inmates exposed to harsh winter conditions without proper winter clothing may indeed suffer "inflictions of pain" that are "totally without penological justification," in violation of the Eighth Amendment.

Defendants' clothing policy is set out in Policy Directive PD–BCF–51.01, which provides in pertinent part that "[a]ll newly committed prisoners" will receive an unlined jacket and that "[w]inter coats, blue corduroy headgear with earmuffs, and long underwear, if requested will be issued to prisoners employed outside in cold weath-

er." In accordance with the policy, inmates are not provided gloves or boots unless they are assigned to an outside work detail, in which event they receive adequate winter clothing. *E.g.*, T at 1539–40; T at 1337; T at 2587; *see* defs. exhs. 385 & 387 (boots and vests). Inmates at the MR and the SPSM in addition are not provided hats; most inmates at the MBP do receive knitted hats, and at least some apparently receive long underwear as well. Pls. exh. 397; T at 1379; T at 1963. The Court has examined the jackets that inmates generally receive during the orientation process. Pls. exhs. 511A & 511B. Exhibit 511A is a lightweight, unlined jacket that is totally inadequate for winter wear. Exhibit 511B is a similar jacket that has a medium-weight lining. Although it is a better winter jacket than exhibit 511A because of the lining, exhibit 511B also is inadequate for winter wear. The Court can take judicial notice of the severity of Michigan winters, and firmly believes that both of these two jackets fail to provide inmates with adequate protection from the cold and snow. Inmates presented credible testimony about the jackets' inadequacy for winter wear. *E.g.*, T at 1963–64; T at 2023. Although there was not a significant amount of testimony about inmates becoming seriously ill due to exposure to the cold, the Court does not believe that inmates are required to establish that they have become seriously ill, or that some of them have died, before being entitled to relief from unconstitutional conditions of confinement. There was abundant evidence, moreover, that inmates, except possibly those confined in segregation units, have to go outside to go to meals, to use the telephone, when they are transferred to other institutions, to go to jobs and other appointments, and for recreational periods.

Defendants did introduce evidence at trial that they are producing and distributing a new coat, defs. exh. 315, that the Court considers to be adequate for winter wear. 3–18–87 T at 119–26. Between March, 1985 and March, 1987 defendants had manufactured and shipped 17,286 of the new coats. *Id.* at 120. A substantial portion of those coats had been sent to the subject facilities. *Id.* at 120–21. Well over half of the inmates at those facilities, however, did not have the new coat during the 1986–1987 winter. T at 242–47; T at 248–58. The Court observes here that it found both Mr. Hines and Mr. Valeroso to be very credible witnesses. In addition, defendants introduced no evidence that they have changed their policy concerning hats, gloves, and boots. Thus, the preponderance of the evidence demonstrates that defendants do not provide all inmates who are unable to provide adequate winter clothing on their own with an adequate winter coat, a hat, gloves, and boots. Even inmates who possess their own coats, moreover, must give them up when they are transferred, and risk never seeing them again.

■ The Court finds, based on the facts in the record, that defendants are failing to provide inmates with adequate winter clothing. As I stated previously, the unlined coat and the coat with the light cotton lining are unsuitable for winter wear, and to force inmates to venture outside in them constitutes the infliction of substantial pain without an adequate penological justification. Moreover, inmates often are forced to forego outdoor exercise due to the lack of adequate winter clothing. Although exercise and other recreational pursuits are not necessarily a core concern of the Eighth Amendment, under certain circumstances a deprivation of recreational opportunities can violate the Constitution. *See Walker*, 771 F.2d at 927–28. Inmates who lack adequate winter clothing, particularly those confined at the MBP where the winters are long and harsh, face a substantial risk of such a constitutional deprivation. *See* T at 1964–66. Even if this were not the case, however, the Court finds, as it stated previously, that defendants are violating the Constitution by exposing inmates to winter weather without providing them with adequate clothing.

The Court realizes that defendants now are manufacturing an acceptable winter coat. As I already have found, however, a majority of the inmates at the subject facilities do not have it. Defendants' official

policy, moreover, pls. exh. 396, requires only that inmates be given an unlined jacket. The Court thus believes it properly can order defendants to provide adequate winter coats, and that this issue is not moot and does not fall under *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), for two reasons. First, a majority of the inmates at the subject facilities have not yet received the new coat. Second, a voluntary cessation of unconstitutional conduct does not preclude a court from granting injunctive relief where it is not convinced that the unconstitutional conduct will not reoccur. In this case, the Court is not so convinced because defendants' official policy on coats has not changed. Finally, defendants produced no evidence that they routinely provide inmates with gloves, hats, and boots. The Court finds that hats and gloves or mittens are required winter clothing at the subject facilities. The Court also finds, however, that boots are not required if inmates are given adequate winter socks and if walkways and outdoor exercise areas are kept free of snow.

One final point the Court will discuss on this issue is defendants' claim that they are not responsible for any constitutional deprivations that may be occurring. Due to the Eleventh Amendment, and under the doctrine of *Ex Parte Young,* plaintiffs have sued defendants in both their official and individual capacities. The Supreme Court recently clarified that "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121 (1985). Given the Eleventh Amendment, the only way a plaintiff can reach state action is to sue individual officers of the State in their official capacities. *See id.* 473 U.S. at 167, 105 S.Ct. at 3106 n. 14, 87 L.Ed.2d at 122 n. 14 ("implementation of state policy or custom may be reached in federal court only because official-capacity actions for prospective relief are not treated as actions against the State"). In an official-capacity action, however, "a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation." *Id.* 473 U.S. at 167, 105 S.Ct. at 3106, 87 L.Ed.2d at 122 (citation omitted). The Court thus must apply the *Monell* standard, *see Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in deciding whether defendants are responsible for any constitutional deprivations plaintiffs may be suffering. *See Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir.1987). This standard is similar to the standard for supervisory liability that the parties have argued in their written submissions. *See Hays v. Jefferson County,* 668 F.2d 869, 872–74 (6th Cir.1982), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). The Court need not discuss this issue further at this time, however, because defendants' actions and inactions regarding winter clothing clearly represent official policy, and it is pursuant to official policy that plaintiffs' constitutional rights are being violated.

In accordance with the above discussion, the Court will grant plaintiffs relief on this issue, and will enter a judgment enjoining defendants to provide inmates with constitutionally adequate winter coats, hats, gloves, and, under specified circumstances, boots. Inmates are exempt from this order if they are confined in areas where they do not have to go outside during the winter. Defendants, however, must provide adequate winter clothing to inmates during all institutional transfers.

### III. *Plaintiffs' Lack of Access to Toilets Claim*

Plaintiffs' third claim concerns only those inmates who are confined at the RCF and the RPC. Certain cells in these two buildings do not have toilets and wash basins in them. Consequently, inmates must use central lavatory facilities. This lack of in-cell sanitary facilities has caused inmates on occasion to have to urinate and to defecate in their cells in nonflushable receptacles. Plaintiffs contend that this situation violates their right under the Eighth Amendment not to be subject to conditions of confinement that constitute cruel and

unusual punishment. Defendants respond that they have a system for releasing inmates from their cells to use the central lavatory facilities that works well, with only occasional sporadic breakdowns, and that no inmate is suffering from cruel and unusual conditions of confinement simply because he does not have a toilet and a washbasin in his cell.

As the Court discussed previously in connection with plaintiffs' winter clothing claim, the Eighth Amendment prohibits States from incarcerating inmates under conditions that, among other things, involve the wanton and unnecessary infliction of pain. This standard encompasses inflictions of pain that are totally without penological justification and conditions of confinement that deprive inmates of the minimal civilized measures of life's necessities. Among the necessities of life the Eighth Amendment protects is sanitary living conditions and personal hygiene. *Walker,* 771 F.2d at 926 & 928. The amendment, moreover, also reaches out to protect the basic dignity of man, which is its primary underlying concept. *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 597, 21 L.Ed.2d 630 (1958) (plurality opinion); *see Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (plurality opinion). It ensures that the State exercises its power to punish "within the limits of civilized standards." *Trop,* 356 U.S. at 100, 78 S.Ct. at 598. In the context before the Court, where prison officials are not required to balance against the safety and constitutional rights of inmates "competing institutional concerns for the safety of prison staff and other inmates," inmates need not prove "[a]n express intent to inflict unnecessary pain." *Whitley v. Albers,* 475 U.S. 312, ——, 106 S.Ct 1078, 89 L.Ed.2d 251, 260–62 (1986). Although mere "inadvertence or error in good faith" will not constitute cruel and unusual punishment, prison officials cannot unnecessarily and wantonly inflict pain on inmates. *Id.* 475 U.S. at 1084, 106 S.Ct. at ——, 89 L.Ed.2d at 260–61.

When faced with a situation where inmates are confined in cells without toilets and washbasins and are forced to depend on corrections officials for access to those facilities, courts can and have followed one of three different approaches. First, a court can find that it is a *per se* violation of the Eighth Amendment to confine an inmate in a situation where he may have to defecate or urinate in a nonflushable toilet or other receptacle, particularly when the inmate has no means of cleansing himself after performing his bodily functions. Several courts have followed this approach, finding that it violates the Eighth Amendment to "lock[] a person, for any significant period of time, in a cell lacking a flush toilet and a washbowl." *Flakes v. Percy,* 511 F.Supp. 1325, 1332 (W.D.Wisc.1981); *see also LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) ("Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted"), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Strachan v. Ashe,* 548 F.Supp. 1193, 1202 (D.Mass.1982) (objecting to the use of a "soil pot"); *Heitman v. Gabriel,* 524 F.Supp. 622, 626 (W.D.Mo.1981) ("[n]o inmate shall be confined for more than one hour in any locked cell which does not have working plumbing"); *Wolfish v. Levi,* 439 F.Supp. 114, 157 (S.D.N.Y.1977) ("it falls today below an acceptable level of humaneness to confine a prisoner of any sex where he or she must solicit freedom to use a toilet"), *rev'd in part and remanded,* 573 F.2d 118 (2d Cir.1978), *rev'd and remanded on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Negron v. Preiser,* 382 F.Supp. 535, 539 n. 4 & 543 (S.D.N.Y.1974) (declining to find a constitutional violation where "only those patients who are free to leave the cells when they choose, or those patients who are so acutely agitated that they overly threaten to use the toilet facilities to harm themselves or others" will be confined in cells without toilets); *cf. Groseclose v. Dutton,* 609 F.Supp. 1432, 1437 (M.D.Tenn.1985) (noting potential problems where "meals must be eaten in the cells, often near a malodorous cement commode"), *appeal dismissed,* 788 F.2d 356 (6th Cir.1986); *Blake v. Fair,* 563 F.Supp.

836 (D.Mass.1983) (finding unconstitutional conditions where, among other things, inmates were confined in a cage area without a toilet or a sink).

A second approach would be to consider that a constitutional violation occurs in a class action context only when the prison's system of releasing inmates to use toilet facilities is inadequate, and instances of inmates not being released to use the facilities are sufficiently frequent that they face a substantial risk of being forced to defecate or urinate in their cells and not being able readily to dispose of their body wastes. Under this approach, a court may grant injunctive relief only if it finds a pattern or practice of noncompliance with a regular release program, or the absence of such a program. *See Osborn v. Manson,* 359 F.Supp. 1107, 1112 (D.Conn.1973) (holding that defendants may confine inmates in cells without toilets if the inmates are "permitted to use bathroom facilities at reasonable intervals and ... permitted to exercise outside their cells for one hour per day"); *cf. Dimarzo v. Cahill,* 575 F.2d 15 (1st Cir.1978) (upholding district court order that did not require defendants to install toilets in cells but only to install them "at the site of existing water and sewer lines"), *cert. denied,* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1979). Prison officials do not violate the Constitution, this approach holds, merely because they confine inmates in cells without toilets and inmates occasionally are forced to defecate or urinate in their cells without the benefit of a flushable toilet and a washbasin.

A final approach would be to hold that prison officials violate the Constitution only if the conditions of confinement pose a serious risk of harm to the inmates' health. Under this approach, even a pattern or practice of inmates not being released to use the bathroom facilities, and thus being forced to defecate or urinate in their cells, would not violate the Constitution if it did not pose a serious risk of harm to the inmates' physical health. *See Miles v. Bell,* 621 F.Supp. 51, 61 (D.Conn.1985) (finding that forcing dormitory inmates to wait to use the bathroom does not cause "significant adverse health effects"; the court contrasted the situation, however, with one where inmates may experience "serious problems of toilets that [do] not flush, leaking toilets, wet floor and water shutdowns"); *cf. Shrader v. White,* 761 F.2d 975, 986 (4th Cir.1985) (finding food service conditions adequate where there was "no evidence of outbreaks of food poisoning, diarrhea, or other diseases which are indicative of unhealthy conditions in the preparation or handling of food"); *Grubbs v. Bradley,* 552 F.Supp. 1052, 1123 (M.D. Tenn.1982) (the Eighth Amendment requires conditions that are "sanitary enough so that inmates are not exposed to an unreasonable risk of disease"); *Collins v. Haga,* 373 F.Supp. 923, 926 (W.D.Va.1974) (the court found sanitary conditions to be adequate, in part because "there is no indication that any inmate has become ill by reason of the conditions").

■ Having reviewed the case law and the parties' written submissions on this issue, the Court concludes that the first view properly interprets and implements the core values of the Eighth Amendment. It is too late in the development of our societal values to permit prison officials to confine inmates in cells where they do not have free access to toilet facilities and a washbasin. I fully agree with the Court of Appeals for the Second Circuit that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted." *LaReau,* 473 F.2d at 978; *see also Bel v. Hall,* 392 F.Supp. 274, 277 (D.Mass. 1975) ("[d]eprivation of elementary sanitary facilities automatically and without having disobeyed any of the institutional rules is not only hazardous to health but connotes an institutional disdain for the inmates which is bound to have a cumulative effect and to produce in them feelings of depression and despair"). Exposing an inmate to a situation where he may be forced to defecate or urinate in his own cell without the presence of proper toilet facilities or a washbasin violates the basic human dignity the Eighth Amendment protects. *See Flakes,* 511 F.Supp. at 1329–32.

Even if I were to follow the second approach, moreover, the evidence in this case, which I will discuss in the following paragraphs, is more than adequate to support a finding that defendants are violating the Eighth Amendment rights of those inmates confined at the RCF who do not have free access, i.e., without staff assistance, to toilet facilities and washbasins. Plaintiffs have established by more than a preponderance of the evidence that defendants do not adequately provide these inmates necessary access to toilet facilities and a washbasin, and thus subject them to a substantial risk of having to defecate or urinate in their room without the benefit of a flushable toilet or a washbasin.

Finally, the Court must reject the third approach, which defendants urge me to adopt. In this context, I believe that requiring plaintiffs to establish that they face a substantial risk of physical harm due to the conditions at the RCF does not give proper weight or respect to the somewhat intangible value of human dignity. The evidence does demonstrate, however, that inmates who are forced to defecate and urinate in their cells at the RCF are exposed to a health risk. See T at 743–47 & 758–60. The Court found Mr. Duel's testimony on this point to be specific and credible. Although Mr. Duel could not quantify the health risk posed to the inmates, the Court finds that a not insubstantial risk does exist, particularly given that inmates are not always provided adequate facilities and materials for cleaning their urinals, i.e., they often have to clean them in the same sinks in which they brush their teeth and wash up and often are given no cleansers to use. T at 1032 & 1055–56 (R & GC); T at 1059, 1414–15, 1806, & 1889 (Protective Custody); T at 1076 & 1093–94 (Administrative Segregation); and T at 1734 (RPC).

To compensate for the lack of toilets and washbasins in certain cells at the RCF and the RPC, defendants attempt to maintain a policy of allowing inmates out of their cells to use the toilet facilities. Since defendants' policy tends to vary with each housing group at the institutions, the Court will discuss it in connection with a separate discussion of the status of each group. Defendants also maintain a regular policy of cleaning the hallways and other common areas at these facilities, and of providing inmates with ample opportunities to clean their own cells on a regular basis. The Court specifically finds that the RCF and the RPC generally are clean facilities, that defendants maintain clean hallways, and, with the exception of areas where urine may be spilled on the floor, see pls. exh. 376a, that the cells are clean. Defs. exhs. 373, 374, 378, 379, & 381. The issue in this context, however, is not necessarily the general sanitary condition of defendants' physical facilities, but whether inmates are given adequate access to toilet facilities. I will discuss this issue separately for each of the four population groups that defendants house at the RCF and the RPC.

The first population group the Court will discuss is the inmates confined in the Reception and Guidance Center, which is located in 7–Building on the first and second floors. Sixty-seven of the cells on the first floor and sixty-three of the cells on the second floor of seven building do not contain toilets or washbasins. Pls. exh. 27 at 13. Inmates are confined in this facility for an average period of two weeks while they are going through orientation and awaiting transfers to other institutions. 4–24–87 T at 20. During that two-week period, they are locked in their cells approximately eighteen hours per day and are allowed out of their cells three times a day for meals and once a day for recreation. Pls. exh. 388; T at 1353–54. They are given a urinal on their arrival at the Reception Center and are told to use it, and to attempt to attract the attention of an officer if they have an emergency. T at 1033, 1054, & 1353. At least two inmates were given a used urinal. T at 1414–15 & 1742. Several inmates testified that they were forced to use the urinals, and on occasion even to defecate in their cells, because they were unable to use the regular toilet facilities. T at 1033 (urinate); T at 1054 (urinate); T at 2298 (urinate); T at 1061 (urine in courtyard from inmates in 7–2 quarantine); T at 2296–97 (defecate); T at 2298

(urinate). This testimony was buttressed by testimony of urine and feces being thrown into the courtyard by inmates confined in the Reception area and the Protective Custody area. T at 1046 (feces and urine); T at 1061–62 (feces and urine); T at 1068 (feces and urine); T at 1078–79 (feces); T at 1417 (inmates in quarantine dumping urinals); T at 1436–37 (feces and urine); T at 1707 (feces); & T at 1885 (inmate dumped urinal out of window).

The Court does not find that inmates throw urine and feces into the courtyard on a daily basis. I do find, however, that it occurs often enough to support a finding that defendants fail to provide inmates in the Reception area with regular access to bathroom facilities and that such inmates often are forced to urinate and defecate in their cells. In this regard, I specifically find that Mr. Waterman's trial testimony was not credible and was insufficient to rebut plaintiffs' evidence. It was not credible because it contradicted his detailed deposition testimony on this issue. Even if it were credible it was insufficient because Mr. Waterman did not deny at trial that inmates frequently throw urine and feces out the windows; he merely stated that it was not a "daily" occurrence. 3–25–87 T at 146.

Defendants in their post-trial submissions have pointed the Court to nothing in the record demonstrating that they provide inmates confined at the Reception Center with regular access to bathroom facilities. The logs they submitted in support of their claim that they provide inmates with such access apparently concern only the protective custody and administrative segregation units. See pls. exh. 362. As I will discuss later in this opinion, moreover, even those logs do not adequately support defendants' position. In summary, the preponderance of the evidence demonstrates that inmates confined in the Reception area are expected to use their urinals, do use their urinals in their cells, and on occasion even are forced to defecate in their cells. The Court already has found, moreover, that defendants do not always provide these inmates with adequate cleaning materials for their urinals.

The second population group housed in seven building is the protective custody unit, which is housed on the third floor of the building. Ninety-six of the cells on this floor do not have toilets or washbasins. Protective custody inmates are locked in their cells during the night, from approximately 10:00 or 11:00 p.m. to approximately 6:00 or 6:30 a.m. During the day they generally are out of their cells on assignments or just around the housing unit. Pls. exh. 27 at 14–15; see T at 1034. As with the Reception Center inmates, inmates in protective custody are provided with urinals and are told to use them. 3–23–87 T at 107; T at 1040; T at 1704. Several inmates testified that they have had to urinate and to defecate in their cells because they could not get out to use the toilet facilities. T at 1040–44 (defecate and urinate); T at 1059–61 (defecate and urinate); T at 1415–17 (defecate); T at 1430–31 (defecate); T at 1704–05 (defecate); & T at 1886–88 (defecate). This testimony also was buttressed by testimony that inmates confined in the protective custody units dump urine and feces out of their windows.

Defendants established on their cross-examination of some of the inmates that correctional officers frequently let inmates out during the night to use the toilet facilities. T at 1708–09; T at 1903. The bathroom logs defendants submitted, moreover, also demonstrate that the correctional officers frequently let inmates out of their cells during the night to use the facilities. Such logs do not, and cannot, however, indicate the number of times the correctional officers have ignored inmate requests to use the toilet facilities. The Court finds that plaintiffs have established by a preponderance of the evidence that inmates frequently are forced or required to urinate or to defecate in their cells, and face a substantial risk of not being allowed to use the toilet facilities when they need to do so. Finally, as I already have found, defendants do not always supply these inmates with adequate cleaning supplies for their urinals, and on occasion have provided inmates with used urinals. T at 1058–59.

Defendants argue that the Court should not consider the situation of the protective custody inmates because they are phasing out that unit and are replacing those inmates with general population inmates, who are given adequate access to toilet facilities. Warden Quarles testified at trial that defendants are converting the protective custody unit to a general population unit, and expect to finish that project by the summer. 4-24-87 T at 21-22. The Court has no evidence, however, that this transition actually has occurred. I agree with plaintiffs, moreover, that even if the transition has occurred defendants have failed to demonstrate that "'there is no reasonable expectation ...' that the alleged violation will recur." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (*quoting in part United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953)). Absent some kind of assurance that defendants will only confine in these cells inmates who will have free access to toilet facilities, without staff assistance, the Court believes it properly can enjoin any unconstitutional conditions that exist regarding the lack of toilets in them.

The third population group housed in seven building is the administrative segregation unit. These inmates are confined in their cells most of the time, being allowed out only to use the toilet facilities and for a daily recreation period of one hour. Pls. exh. 29 at 17. There are approximately twenty inmates confined in the segregation unit. Defs. exh. 313. Correctional officers make regular bathroom runs four or five times a day, during which time inmates are allowed out of their cells to use the toilet facilities. Pls. exh. 369; Seg.Record dated 11-18-85. In addition, correctional officers make rounds on the unit every one-half hour, during which time inmates can request to be allowed to use the toilet facilities. 4-24-87 T at 19; pls. exh. 27 at 15; pls. exh. 29 at 21.

These requests are not always granted, however, particularly during the late night and early morning hours. Defendants' green log book for the segregation unit indicates that inmates are occasionally allowed out of their cells during the early morning hours to use the toilet facilities. Once again, however, the logs do not reflect the times when an inmate is not allowed out of his cell to use the facilities. *See* T at 1091-93; T at 1890-91; T at 1077. Plaintiffs' evidence of administrative segregation inmates being forced to defecate or urinate in their cells is less convincing than their evidence on inmates confined in protective custody and in the Reception Center. Instances of these inmates being forced to urinate or defecate in their cells present significant constitutional concerns, however, because they are locked in their cells most of the time and must eat their meals in their cells. See pls. exh. 30 at 11; pls. exh. 29 at 14-15. They are not, moreover, always allowed to wash themselves before mealtimes. T at 1094; T at 1077. Under such circumstances, the Court finds that defendants are violating the Eighth Amendment rights of the administrative segregation inmates by confining them in cells without toilets or washbasins.

As a concluding note on the administrative segregation inmates, the Court observes that the parties dispute whether the current American Correctional Association standards for Adult Correctional Institutions require defendants to give inmates in segregation units free access to toilet facilities. Defendants argue that standard 2-4130 of the January 1986 supplement indicates that prison officials are not required to provide inmates in segregation units with free access to toilet facilities. Plaintiffs respond that the January 1986 revisions did not affect standard 2-4135, which does require prison officials to provide inmates in segregation units with free access to toilet facilities. Plaintiffs attached standard 2-4135 to their post-trial brief on this issue. The Court believes that plaintiffs probably have the better of this argument. I do not find the ACA standards on this issue to be persuasive one way or the other, however. This is one issue on which the Court finds expert opinion to be helpful, but not persuasive. *See Rhodes*, 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13.

The final population group the Court will consider is the inmates confined in the Riverside Psychiatric Center, which is in 11 building. Forty-eight of the rooms in the east wing of this building do not have toilets or washbasins in them. Most of the inmates confined in these rooms are not locked in their cells and are allowed free access to toilet facilities, except during the relatively brief count times. 3–25–87 T at 148 & 159. Some inmates, however, are in seclusion, during which time they are not free to leave their cells to use the toilet facilities. *Id.* at 151–52. Approximately one to three inmates may be on seclusion at a time in the east wing of the building, although the number could be as high as twelve. *Id.* at 152–53 & 157. Many of these inmates take psychotropic medications that increase their thirst for liquids, and consequently also increase the frequency of their urination. T at 3300–04.

To cope with this problem, defendants occasionally place urinals in the seclusion cells. 3–25–87 T at 157. These inmates also are offered a toilet break every two hours and are checked every fifteen minutes, during which time they may request to use the bathroom. *Id.* at 152. It appears, however, that nurses occasionally may delay allowing an inmate in seclusion out to use the bathroom if he or she believes the inmate is merely playing games. *Id.* at 159. In addition, there is evidence that not more than two inmates are allowed out of their rooms at any one time to use the bathroom facilities. See pls. exh. 368. Finally, there was some evidence that inmates confined at the RPC in cells without toilets have urinated and defecated in their cells. T at 1736–37 & 1740–41; T at 1897.

Defendants contend that even inmates in cells with toilets at the RPC occasionally urinate and defecate in their cells, and that "the problem in 11 building has more to do with the medical problems of individual inmates, rather than the physical plant." They cite to Dr. Bort's deposition testimony, introduced by the plaintiffs, in support of their contention. The Court has reviewed the admitted portions of Dr. Bort's deposition and finds nothing in them indicating that inmates in cells with toilets urinate and defecate on the floor of the cell. Dr. Bort did testify at his deposition, however, that the State Department of Mental Health is opposed to placing toilets in the cells at Riverside. Pls. exh. 4 at 11. Plaintiffs' psychiatric expert, Dr. Rundle, testified, moreover, that patients may urinate and defecate on the floor even when they have direct access to toilet facilities and that most mental health hospitals have some seclusion rooms without toilets and sinks. T at 3314. Dr. Rundle did indicate he disagrees with defendants' use of the seclusion rooms at Riverside and with the Department of Mental Health's rationale for not wanting toilets in the cells. T at 3314–16.

In accordance with the above discussion, the Court concludes that defendants are violating the Eighth Amendment by confining inmates in cells without toilets or washbasins at the RCF and not allowing such inmates free access to central toilet facilities. The basis for the Court's holding differs for the various population groups confined at this facility. With respect to the inmates confined at the Reception Center and in protective custody, the preponderance of the evidence clearly demonstrates that these inmates are not allowed adequate access to the central toilet facilities, and often are required to urinate or defecate in their rooms without the benefit of a flushable toilet facility. Defendants, moreover, expect inmates to use the urinals they give them when they first enter the facility. Under both the first and second of the three approaches to this issue it discussed at the beginning of this section, the Court finds that defendants are violating the Eighth Amendment rights of inmates confined in the Reception Center and in protective custody. Simply put, it violates the basic dignity of these inmates to require them to urinate and to defecate into improper containers and to live in close proximity to their body wastes. Defendants are using a medieval building in the 1980s.

The situation is a little different for the inmates in the administrative segregation unit and the inmates in the Riverside Psy-

chiatric Center. Defendants have established that inmates in the administrative segregation unit generally are allowed access to toilet facilities. The Court cannot, however, ignore the significant risk, which plaintiffs have established exists, that these inmates may be required to defecate or urinate in their cells, particularly in the late night and early morning hours. This risk is exacerbated by the lack of washbasins or other cleaning materials in the cells and by the fact that these inmates are forced to eat in their cells, often times without the opportunity to clean up before the meal. The Court thus finds that defendants' treatment of the administrative segregation inmates at the RCF also violates the Eighth Amendment. It violates the Eighth Amendment to lock an inmate, for any significant period of time, in a cell without an operable toilet and washbasin. Even though the administrative segregation inmates are not forced to urinate or defecate in their cells as frequently as the Reception Center and protective custody inmates are, the risk that they will have to do so exists and it is defendants' official policy of not having toilets or washbasins in those cells which subject them to that risk.

■ The Court declines to find an Eighth Amendment violation with respect to those inmates confined at the RPC. The only Eighth Amendment problem in this unit concerns inmates who are on seclusion status. Inmates who are not in seclusion have regular access to toilet facilities, and I cannot accept plaintiffs' argument that I should issue an order covering all of the cells in eleven building simply because defendants may at some time use them for other purposes. The evidence produced at trial established that defendants currently limit toilet access only for inmates in seclusion; there was little, if any, evidence that this policy may change in the future. With regard to the seclusion inmates, I cannot ignore Dr. Bort's testimony that the Department of Mental Health is opposed to placing toilets in the cells and Dr. Rundle's testimony that most mental health hospitals have and employ seclusion rooms that do not have toilets or washbasins. Dr.

Rundle indicated that defendants are not properly employing the seclusion rooms at Riverside, but plaintiffs produced no other evidence on that issue. I thus cannot find that it violates contemporary standards of decency for defendants to confine inmates at the RPC in seclusion cells without toilets or washbasins.

The Court thus will enter an order granting plaintiffs partial relief on this issue. Since it is defendants' official policy to confine inmates at the RCF in cells without toilets, there can be no question as to their responsibility for the constitutional violations that are occurring. I am not unsympathetic, however, to defendants' need for these administrative segregation and protective custody cells. I therefore will not, at this time, adopt plaintiffs' suggestion that I enjoin defendants from confining any inmate, absent emergency conditions, in a cell without an operative toilet and washbasin for more than forty minutes. Rather, I will give defendants sixty (60) days from the date of this opinion to produce a plan for remedying the deficiencies that exist at the RCF. Plaintiffs shall then have thirty (30) days to comment on the plan. The Court thereafter will either accept defendants' plan, order defendants to produce a revised plan, or impose its own plan on defendants.

IV. *Plaintiff's Access to Court's Claim*

Plaintiffs' fourth claim is that defendants are denying them their constitutional right of access to the courts by failing to satisfy their obligation to assist inmates "in the preparation and filing of meaningful legal papers by providing" them "with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). Before discussing the merits of plaintiffs' claim, the Court will address two preliminary matters.

The first preliminary matter concerns the case of *Walker v. Johnson*, which was remanded, in part, by the Sixth Circuit to the District Court for the Eastern District of Michigan in 1985. *Walker v. Mintzes*,

771 F.2d 920 (6th Cir.1985). One of the issues discussed by the Sixth Circuit, and remanded to the District Court, was whether the Michigan prison system provides inmates confined at the SPSM, the MR, and the MBP with adequate access to the courts. The class of inmates involved in the *Walker* proceeding apparently is the same class of inmates that is involved in this proceeding. Unfortunately, neither of the parties to this case informed the Court that the Sixth Circuit had remanded the access to courts issue to Judge Newblatt for further proceedings, or requested the Court to stay any proceedings on that issue since it already was before Judge Newblatt. Defendants did file a motion for partial dismissal on September 25, 1985 that was based in part on the *Walker* decision. They did not discuss the access to courts issue in their motion and brief, however, and did not request the Court to defer to the proceedings before Judge Newblatt. The Court realized for the first time the nature of the issue and the status of the proceedings before the Eastern District as it was preparing this opinion.

It may be regrettable that there have been two federal court proceedings involving the same issue and the same class of inmates. Nevertheless, given the status of these proceedings, I see no reason not to decide plaintiffs' claim. It simply is too late in the game for me not to decide the access to courts issue. In addition, I note that Judge Newblatt issued his decision in 1982. I have no idea what evidence Judge Newblatt had before him and have only his opinion as evidence of the condition of Michigan's law library system at that time. The Court thus does not believe it is in any way precluded from ruling on plaintiffs' claim, except of course to the extent that it must follow the Sixth Circuit's rulings in *Walker* on this issue.

The second preliminary matter is defendants' April 23, 1987 request that I take judicial notice of state and federal court records concerning lawsuits brought by three inmates who testified on the access to courts issue. Defendants contend that these records impeach part or all of the witnesses' testimony and indicate that they provide inmates with adequate access to the courts. Plaintiffs oppose defendants' request. They argue, in essence, that the Court should not grant the request because defendants waited until the last moment to file it, and thus precluded them from presenting rebuttal evidence, and because the Court had prevented them from submitting rebuttal grievances on the ground that defendants would not have an opportunity to explain or to rebut the grievances.

Rule 201(d) of the Federal Rules of Evidence provides that "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." Paragraph (e) of the rule provides that a party is entitled to "an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed" while paragraph (f) states that "[j]udicial notice may be taken at any stage of the proceeding." As defendants argue, courts routinely take judicial notice of court records. *E.g., E.I. Du Pont de Nemours & Co. v. Cullen*, 791 F.2d 5, 7 (1st Cir.1986); *Moore v. Estelle*, 526 F.2d 690, 694 (5th Cir.1976), *cert. denied*, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1192 (1977). Moreover, also as defendants argue, the records they seek to introduce are relevant to this proceeding. Plaintiffs do not contest the records' accuracy or, for the most part, their relevancy.

■ Rule 201 and the cases defendants cite in their briefs seemingly require the Court to take judicial notice of the court records. I believe, however, that the rule is not as mandatory as it appears to be, and under the peculiar circumstances of this case deny defendants' request. I base my decision on three grounds.

First, judicial notice is an alternative means of proof that is subject, like all other offers of evidence, to rules 403 and 611(a). *See Ohio Bell Telephone Co. v. Public Utilities Commission*, 301 U.S. 292, 301–02, 57 S.Ct. 724, 729, 81 L.Ed. 1093 (1937) ("notice, even when taken, has no other effect than to relieve one of the parties to a controversy of the burden of resorting to the usual forms of evidence"; " '[i]t does

not mean that the opponent is prevented from disputing the matter by evidence if he believes it disputable' ") (citation omitted); *Colonial Leasing Co. v. Logistics Control Group Int'l*, 762 F.2d 454, 461 (5th Cir. 1985) ("it is clear that the court's power to take judicial notice 'at any stage' may be circumscribed by other considerations"). Secondly, defendants did not give plaintiffs fair notice of their intent to request the Court to take judicial notice of the court records. The relevant witnesses testified in August, 1986 (August 13th (Kingon), August 15th (Kemp-Bey), and August 25th (Cade)). Yet defendants did not produce the court records until April 23, 1987, only five days (including two weekend days) before the end of trial, thereby effectively denying plaintiffs any opportunity to present the three inmates as rebuttal witnesses. Arguably plaintiffs were able in their June 9, 1987 reply brief to rebut any inferences the Court could draw from the records. Normally, the Court would accept such a written submission in lieu of live rebuttal testimony. I decline to do so here, however, because the credibility of the witnesses is important and defendants are in effect offering the records in lieu of, or as a supplement to, their cross-examination of the inmates.

Finally, defendants' request simply strikes me as being unfair, and I believe that it would be inconsistent with my other evidentiary rulings to grant it. I have tried to be fair to both parties in admitting evidence while remaining cognizant of the fact that I must determine what conditions presently exist in the subject institutions. In trying to achieve these goals, I have excluded some evidence I arguably should have admitted and have admitted some evidence I arguably should have excluded. In this instance, given defendants' inexcusable delay in requesting me to take judicial notice of the court records, I deny their request. I note, however, that the records concern only three of the inmates who testified on the access to courts issue and that even without this testimony, plaintiffs produced sufficient evidence to satisfy their burden of proof.

Turning now to the merits of plaintiffs' claim, this was a difficult issue to decide. As I will discuss, plaintiffs' proofs, although adequate, were not overwhelming. In addition, the published case law is in conflict, with courts enunciating interesting, thoughtful, and sometimes widely varying views on access to the courts. This also is an area in which this Court, like most other federal district courts, has substantial personal knowledge of the issues and of the difficulties inmates face in presenting their concerns to a court. I have reviewed numerous prisoner petitions, some of which were well-written and well-researched, and others of which reflected a complete lack of legal knowledge and of the ability to write coherent sentences and paragraphs. Finally, this is an area in which the Court, as one who uses legal resources and hears and decides cases on a daily basis, has a special interest. Nevertheless, the Court must decide plaintiffs' claim in accordance with the law and the evidence produced at trial. I will discuss my factual findings, the legal standards I must consider, and finally my conclusions of law. Any legal conclusions I may make in my factual discussion shall be considered part of my conclusions of law.

### Defendants' Law Library System

Defendants have chosen to meet their obligation to assist inmates "in the preparation and filing of meaningful legal papers" primarily by providing them with law libraries. They have contracted with Prison Legal Services of Michigan to provide some representation to inmates at the SPSM. Pls. exh. 108. Prison Legal Services cannot, however, represent inmates in civil rights actions against the Department of Corrections or its employees; it has insufficient staff to meet the demands of the inmates; and its services are available only to inmates confined at the SPSM. See T at 505–06. At each institution, therefore, defendants maintain a main law library that most of the general population inmates can use. Inmates in administrative segregation, punitive detention, and protective custody, and many minimum security inmates, do not, however, have direct physical ac-

cess to these main law libraries. For these inmates, defendants attempt to satisfy their legal obligation by providing them with access to "mini-law libraries" and by allowing them to request books from the main law library. Since defendants have chosen to provide inmates with law libraries, I must evaluate their adequacy and must determine whether they provide inmates with meaningful access to the courts. Since each of the institutions has a different library structure, I will discuss them separately.

First, I consider the facilities available at the State Prison of Southern Michigan. Two complexes of this institution, the north complex and the south complex, are involved in this issue. Both complexes have their own law libraries that contain the required minimum collection. See pls. exh. 115. Each library, in addition, has access to the central complex law library, which contains many materials that are not on the required list. 3–19–87 T at 118; see defs. exh. 258 & 278a. Defendants inventory their holdings on a semi-annual basis and regularly order and receive updated materials and replacements for materials that have been reported lost or damaged. See defs. exhs. 257, 257a, 253, 252a, 251b, 251c & 251d; pls. exh. 120 & 121; 3–19–87 T at 158–60; 3–23–87 T at 12–14. The inventories occasionally are disorganized and imprecise in identifying missing volumes. See pls. exh. 121. I find, however, that the north complex and south complex law librarians generally keep their collections up-to-date and in order. I also find, though, that there are certain materials not required by official policy, see PD–BCF–61.01, and which these libraries do not otherwise have in their collections, to which the inmates should have direct access: (1) a complete set of the Wright and Miller treatise on Federal Practice and Procedure, which the Court itself regularly uses (the libraries carry only volumes 1–3A of this treatise; although the central complex library carries the complete treatise, given its value to those pursuing federal court litigation, the north and south complex libraries also should carry it); (2) Michigan civil jury instructions (the law libraries

carry only the criminal jury instructions); and (3) all of the local court rules for the state and federal courts (it appears that only the north complex library carries the federal local court rules).

The law libraries' physical facilities are cramped, particularly at the south complex, but adequate. See defs. exhs. 327–28 & 331–34. The north complex law library is housed in the academic school, along with the general library, and seats 18–22 inmates (which includes general library inmates). 3–23–87 T at 7 & 24. The north complex has never turned any inmates away because of space limitations. Id. at 10. Books are available in the library on a call-out basis; the inmate requests a book from the inmate law clerk, who then retrieves it for him. An inmate can request up to three books at a time. By system-wide policy, each inmate is entitled to six hours of library time per week, in two-hour segments, plus extra time if needed. In addition, the law libraries are supposed to be open a minimum of 25 hours per week, with at least one-half of those hours after 5:00 p.m. or on weekends. See pls. exh. 130; def. exhs. 256 & 274. The north and south complex law libraries generally are open for the required number of hours, although there are times when they are closed, particularly in the north complex, due to staff absences. T at 950–51. The closures, however, although regrettable and a situation defendants certainly should rectify, are not sufficiently frequent to infringe on the inmates' right of access to the courts.

The south complex law library is housed in a trailer that can accommodate about nine inmates at a time. Although the available space is small, the librarian testified that he never has had to turn anyone away because of lack of space, 3–19–87 T at 152, and the evidence in the record does not establish that the small space is a significant problem. As with the north complex library, books are available to inmates by request and each inmate generally is limited to three books at a time. Inmate access to both libraries generally is on a call-out basis, pursuant to which an inmate submits

a request to use the law library, and then is placed on a call-out sheet by the librarian or inmate law clerk and allowed to go to the library by the correctional officers for his housing unit. See defs. exh. 256 & 274. In the south complex, some inmates have a detail to the law library, pursuant to which they are allowed to go to the library at a scheduled time on a regular basis. The Court heard some evidence that inmates are not able to use the law library because its hours conflict with academic or work assignments, *e.g.*, T at 2542–43 & T at 951; that inmates are denied access to the law libraries; and that inmate law clerks, particularly in the north complex, deny access to inmates they do not like. These situations are not, however, sufficiently frequent or egregious to infringe on the inmates' right of access to the courts, although I certainly condemn them. The call-out system of library access is susceptible of, and occasionally subject to, abuse by staff and inmate law clerks. The evidence does not demonstrate, however, that it is being improperly implemented at the north and south complexes on a class-wide basis.

In terms of staffing, both libraries are headed by civilian law librarians. The south complex librarian has an associates degree in library technology; the north complex librarian has a bachelor's degree, but no specialized training in librarianship. Both librarians have attended a two-day state sponsored workshop on legal research. They are not, however, allowed to assist inmates in legal research, other than to offer advice on where to look for guidance. See 3–19–87 T at 1661 3–23–87 T at 34 & 49; pls. exh. 142. I specifically find that the librarians are not qualified or competent to perform legal research, or even to offer inmates sound legal advice on where to research their specific problems. In particular, I heard no evidence from defendants indicating that their two-day legal research workshop is adequate training for the librarians, and I seriously doubt that it could be. The central complex librarian, who directly supervises the north and south complex librarians, does have a master's degree in library science from the University of Michigan and significant ex-

perience working in law libraries. There was no evidence, however, that she provides advice on inmate requests for legal assistance.

In addition to the civilian staff, the law libraries hire inmates to act as law clerks. They generally attempt to hire as clerks inmates who have shown an interest in, and some knowledge of, legal research. See 3–19–87 T at 113–14. They do not, however, have a formal training program for the inmate law clerks, and more importantly do not allow them to assist other inmates in their legal research. *E.g.*, 3–19–87 T at 167; pls. exh. 138. In general, the record more than adequately demonstrates, for all of the institutions, that inmates usually must conduct legal research and draft complaints and other pleadings on their own. Inmates are not allowed to assist each other absent written authorization from prison officials or unless they are co-defendants. See pls. exhs. 113–P, 114, & 99. Few inmates use the written legal agreements for assistance, primarily because they are not always approved and because one of the inmates to the contract may be transferred to another institution, thereby effectively severing the relationship. *See, e.g.*, T at 534–35, 548–49, 557, 583, & 653–54; T at 981–82.

In addition, the often-fabled jailhouse lawyers or writ-writers are, at least in the Michigan system, too few and often too uninformed to provide adequate assistance to the inmates. T at 543–44; T at 1541–42 (jailhouse lawyer unavailable after complaint was filed; case later dismissed); T at 1603–12 (general difficulties with jailhouse lawyers; had to pay one $150.00); T at 1656–59 (had to pay inmate $25.00; inmate later transferred); T at 1692–93 (staff, but not the named defendants, discouraged inmate from assisting other inmates); T at 1162–68 (payment for services of jailhouse lawyers); T at 1770–75 (payment for services; also problems when "lawyer" transferred); T at 2118 (could not pay charge for jailhouse lawyer); T at 2398–99 (payment for services); T at 2440–41 (indicating demand for money for services); T at 2657–58 (law librarian forbade inmate assistance ab-

sent approved contract); & T at 3139 (inmate transferred before contract was approved). The payment of money for these services can, of course, create serious conflicts among the inmate population, *cf.* T at 940, and defendants commendably attempt to regulate the situation by requiring an approved written contract of assistance. As the Court already has found, however, inmates rarely use defendants' system and the system cannot assure assistance to inmates who require it. Indeed, defendants do not vigorously argue that inmates have adequate access to legal assistance from either other inmates or official staff.

I shift my focus now to the Michigan Reformatory. The MR offers inmates legal assistance in the form of a main law library and three "mini-law libraries." The so-called mini-law libraries are available to inmates confined in administrative segregation and protective custody, and inmates who are in transition from one housing unit or institution to another. It appears that one "mini-law library" has been closed, 3–23–87 T at 84 & 97–98, and that defendants currently have "mini-law libraries" only for inmates in administrative segregation (the Adjustment Center) and protective custody. The MR also has a dormitory unit, which houses minimum security inmates. By policy, inmates in this unit who wish to use a law library must request a temporary transfer to the SPSM. Pls. exh. 115. All other inmates at the MR have access to the main law library.

The main law library is housed in a building along with the general library. 3–23–87 T at 72; see defs. exh. 317. The space is adequate for the inmates' needs. Inmates generally have access to the law library on a call-out basis. 3–23–87 T at 87–89. As was the case with the SPSM libraries, the Court heard testimony indicating inmates occasionally are denied access to the law library, either because of improper actions by the inmate law clerks or because of staff error. In addition, the MR has had difficulty maintaining regular hours because it was without a head librarian for a while in 1986 and 1987. It recently hired a head librarian, however, who has a MLS degree in librarianship and experience working in prison law libraries. Defs. exh. 385 at ¶ 6. The Court heard no evidence, moreover, indicating that the inmates as a class had difficulty getting access to the main law library or that inmates have been denied access to the courts because of this situation.

The main law library maintains the required legal materials as well as some supplemental materials. Like the SPSM law libraries, however, the MR library does not have a complete set of the Wright and Miller treatise, the Michigan civil jury instructions, or the local rules for the federal district courts. In addition, the MR apparently carries an out-of-date treatise on habeas corpus law that was published in 1969. This is a glaring omission given the number of habeas writs filed in this Court. Defendants do not, moreover, conduct adequate inventories of the collection to ensure that it is kept up-to-date. See defs. exh. 284. The Court thus has no assurance that the MR collection is adequate for the inmates' needs.

The situation in the "mini-law libraries" is even worse. These "libraries," by policy, are required to carry only an extremely limited selection of materials. Pls. exh. 115. Although inmates can request books from the main law library, the "mini-law libraries" contain no digests and few treatises in which an inmate can locate cases to request from the main law library. In addition, defendants' exhibit 283 indicates that the I–Block mini-law library carries an out-of-date treatise on habeas corpus law and only a nutshell treatise on criminal law and procedure (although it does have the Gillespie treatise on Michigan criminal law and procedure). Even then, required materials often are missing from the libraries. T at 553–55; pls. exh. 161; 3–23–87 T at 84. Inmates confined in administrative segregation rarely, if ever, have direct access to assistance from other inmates or from staff. There also was some testimony that inmates are not always aware they can request books from the main law library and do not always receive what they have requested. See T at 2807; T at 1721. Even without these obstacles, inmates in

these mini-law library units generally are allowed to request only five books at a time, three times a week, from the main law library. As I will discuss later in this opinion, this access is not adequate· for a segregation inmate to be able to prepare a meaningful complaint.

Defendants staff the MR library with a head librarian and an assistant librarian. The head librarian has an advanced degree in librarianship and experience working in prison law libraries. The assistant librarian has a bachelor's degree in social work. Though they are qualified prison librarians, both persons, like the SPSM librarians, cannot provide much assistance to the inmates. In addition, the Court's findings on other sources of inmate assistance at the SPSM, particularly in terms of the inmate clerks and jailhouse lawyers, apply also to the Michigan Reformatory. I find in particular that inmates in the segregation unit, in protective custody, and in the transition unit generally do not have access to sources of legal assistance other than the "mini-law libraries," which, as I have found, are pathetically inadequate, and the main law library via book requests, which does not provide them an adequate opportunity to conduct meaningful legal research. Plaintiffs' exhibit 101 and Mr. Graves' testimony indicate that protective custody inmates are allowed direct access to the law library twice a week. Although this evidence contradicts defendants' policy directive, the Court finds that protective custody inmates are allowed limited access to the main law library for three hours per week. They still, however, primarily depend on the mini-law library and requests for books from the main law library for their research. See 3–23–87 T at 93.

The final institution to be analyzed is the Marquette Branch Prison. Like the MR, the MBP services its inmates through a main law library and a system of "mini-law libraries." The main law library is located in the general population section of the institution, in the academic school. It can accommodate approximately fifteen (15) inmates at a time and appears to be large enough to serve the general population inmates' needs. 3–24–87 T at 115–16; *see*

defs. exhs. 324–326. There are five "mini-law libraries," which are located in A-Block (protective custody), B–Block, D-Block, E–Block, and F–Block. 3–24–87 T at 132. As was the case at the MR, these mini-law libraries and whatever books the inmates can procure from the main law library provide segregation and protective custody inmates with their only access to legal assistance. In addition, there are inmates confined at the trustee division, which is outside of the prison walls, who also are serviced through the main law library. The trustee division has a small collection of books, but it cannot really be called any kind of a library.

The main law library at the MBP contains all of the books required by policy, and the librarian at the institution inventories the collection twice a year to keep it up-to-date. See defs. exhs. 299a, 299b, & 299c. There is no indication in the record that this library contains much beyond the required collection, except for a prisoner self-help litigation manual. 3–24–87 T at 132. In addition, the library does not contain the materials the Court already has found should be added to the collections at the MR and the SPSM. *See supra* at 38–39. The mini-law libraries also contain the materials required by official policy, and the Court is satisfied that the librarian at the MBP keeps the mini-law library collections reasonably up-to-date. Plaintiffs' expert, Mr. Wilbur, testified that when he toured the "mini-libraries" in April, 1986 several items were missing from them. T at 564–66 & 572. In addition, several inmates testified as to missing materials. *E.g.*, T at 2256; T at 2112; & T at 2214. Defendants' librarian, Ms. Baker, testified, moreover, that she had had some difficulties with the "mini-law library" collections. 3–24–87 T at 131. She also testified, though, and defendants' exhibit 299c indicates, that the collections currently are in good shape. *Id.* at 133. The Court thus finds that defendants maintain the required materials at the "mini-law libraries."

The general population inmates generally have adequate access to the main law library. The library is open 27.5 hours per

week, defs. exh. 297a, and each inmate is allowed six hours of access per week, plus additional time if needed. *Id.* Although the Court is troubled by the lack of adequate night-time and weekend hours, which appears to violate defendants' official policy, pls. exh. 115 at 3; *see* pls. exh. 61, and even though there was testimony indicating inmates have been improperly denied additional law library time, see T at 1973–74, the Court does not find that inmates have been hindered in pursuing their cases because of the main law libraries' hours. As is the case at the MR, the head librarian at the MBP has a master's degree in library science, but does not assist inmates in their legal research. The inmate law clerks who assist the librarian also do not assist inmates in their legal research. 3–24–87 at 139–40. In addition, the Court adopts here its prior findings concerning inmate access to legal assistance from staff or other inmates.

In the segregation units, inmates are supposed to have access to the "mini-law libraries" for two hours per week. Unlike the general population inmates, the segregation inmates experience some difficulty in getting even this limited access. See T at 2596; T at 2255; T at 2051; & T at 1613–15. Inexplicably, inmates in one of the segregation blocks are even required to use the mini-law library during the middle of the night. T at 566–67; T at 1177 & 1199; & T at 1284. When the inmates do get access to a mini-law library, they often find it inadequate for their use. *E.g.*, T at 2596–97; T at 2255–56; & T at 1615. In addition, there was substantial testimony and documentation (see pls. exhs. 70, 91 & 102) indicating that inmates often are unable to get even the fifteen books a week they are allowed to receive from the main law library.

Defendants' exhibit 250A indicates that inmates in A–Block (formerly the MIPC) receive a number of books from the main law library. Even assuming, however, that the main law library can and does fill 80% of the requests segregation inmates submit, see 3–24–87 T at 127, an inmate still will receive only an average of twelve books per week. As is the case with the MR mini-law libraries, moreover, the MBP mini-law libraries contain few, if any, digests or treatises from which inmates can get case citations and thus know what case books to request from the main law library. It is impossible for them to conduct effective legal research under such a system, and the system is inadequate to provide them with effective access to the courts. *See infra* at 56. The situation is much the same in the trustee division, which has only a small law library and thus must depend on the main law library for most of its legal materials.

In summary, I find that the main law library at the MBP does not contain a sufficient number of the required materials to service properly the general population inmates, the segregation and protective custody inmates, and the inmates at the trustee division. The main law library simply has to serve too many different housing units for the collection it has. *Cf.* pls. exh. 61. The situation is different than one where a number of inmates are using the same library. In the latter context, one copy of a book may suffice because any one inmate will have the book out for a maximum of two hours. If a book is sent to a segregation unit or to the trustee division, however, then it may be unavailable to other inmates for several days.

As the preceding factual discussion indicates, inmates at the subject facilities, particularly those who do not have direct access to the main law libraries, often are unable to conduct meaningful legal research or to gain assistance from persons who have some legal knowledge. I find that because of these barriers to legal research and deficiencies in defendants' law library system, inmates often are unable to file meaningful complaints or to defend properly their complaints against motions to dismiss and motions for summary judgment. Some inmates are able to use the system to prepare effective complaints and to gain relief on their claims. See T at 966–67; T at 987–89 (with attorney assistance on the criminal cases); T at 1755 (responded to motions); T at 2816 (got misconduct setaside); & T at 3143 (recovered

monetary award). A far greater number of inmates, however, are unable to use the system to gain meaningful access to judicial forums. See T at 1174–78 & 1247 (case dismissed; had trouble responding to motion); T at 1282–86 (unable to access books); T at 1541–45 & 1548 (unable to prepare effective response; made only one request for books); T at 1612–17 (could not respond to Magistrate's Report and Recommendation); T at 1658–62 (unable to respond to court orders); T at 1673–76 (delays in getting books; could not get two books at all); T at 1721 & 1725 (access delayed for ten months); T at 1767–69, 1776–77, 1787–88, 1819–20 (unable to respond to Report and Recommendation and to motion for summary judgment; suit is still pending); T at 1850 & 1851–5 (lost in library; had difficulty with administrative segregation library); T at 2211–14 (had difficulty with administrative segregation library); T at 2300–03 (unable to file delayed appeal); T at 2435–41 (could not use law library; did not know what to do); T at 2594–95, 2596–97, 2598, 2604–10 (although has filed suits and responded to motions, had difficulty getting adequate access to materials); T at 2661–67 (could not file timely, effective response to Reports and Recommendations); T at 3014 (could not file meaningful habeas corpus petition; could not respond to state's submission).

I am aware that some inmates do not use their full efforts in pursuing their legal grievances. I also am aware that defendants, because of security and other concerns, may legitimately restrict certain inmates' access to the law libraries and other sources of legal assistance. For all inmates, and particularly for inmates confined in the segregation units, inmates in protective custody, and certain minimum security inmates, however, the Court finds, as a factual matter, that defendants do not provide adequate access to legal materials or other sources of legal assistance, that defendants have not justified this denial of access, and that this denial of access has precluded inmates from filing meaningful legal papers and from effectively pursuing their legal remedies.

In addition to the adequacy of defendants' law libraries, including whether inmates who need assistance from other persons are able to get it, plaintiffs also challenge defendants' policies, procedures, and practices concerning photocopying of cases, complaints, and other legal documents; inmates' ability to call their attorneys; visits by attorneys to inmate clients; the care of inmates' legal materials during transfers; and inmates' access to notaries. In each of these areas, although inmates occasionally have difficulty and sometimes are hindered in their efforts to pursue legal remedies, I do not find, as a factual matter, that plaintiffs have established by a preponderance of the evidence that there is a need for judicial intervention.

*Defendants' Constitutional Obligation*

Any analysis of an access to courts issue must begin with the Supreme Court's decision in *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In *Bounds* the Supreme Court was faced with the issue of "whether States must protect the right of prisoners to access to the courts by providing them with law libraries or alternative sources of legal knowledge." *Id.* The Court, elaborating on its prior decisions in *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (*per curiam*), and *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), answered that question affirmatively, holding that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498; *see Patterson v. Mintzes*, 717 F.2d 284, 288 (6th Cir.1983) ("Prison officials are charged with the responsibility of assuring that inmate access to the courts is 'adequate, effective and meaningful' ") (citation omitted); *Holt v. Pitts*, 702 F.2d 639, 640 (6th Cir.1983) (a State must provide a prisoner with either a law library or "the assistance of legally-trained personnel"). State officials are given substantial discretion in deciding how to

implement the holding of *Bounds,* and a court reviewing a State's system must evaluate it "as a whole to ascertain its compliance with constitutional standards." *Bounds,* 430 U.S. at 832, 97 S.Ct. at 1500. Whatever system a State chooses, however, must ensure that "inmate access to the courts is adequate, effective, and meaningful."

The vagueness of the Supreme Court's decision in *Bounds* has led lower federal courts to issue differing interpretations of what a State must do to ensure that inmates have meaningful access to the courts. Some courts have indicated that a State need only provide inmates with access to an adequate collection of law books, regardless of whether the inmates are able to use the materials. *See Campbell v. Miller,* 787 F.2d 217, 229–30 (7th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 673, 93 L.Ed.2d 724 (1987); *Morrow v. Harwell,* 768 F.2d 619, 623 (5th Cir.1985); *Cepulonis v. Fair,* 732 F.2d 1, 6 (1st Cir.1984); *see also Hooks v. Wainwright,* 775 F.2d 1433, 1437–38 (11th Cir.1985) (inmates are not constitutionally entitled to an attorney if the State provides access to an adequate collection of law books), *cert. denied,* — U.S. —, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986). Other courts, however, and in particular two district courts in this circuit, have found that a State may not always be able to satisfy its obligation under *Bounds* simply by providing inmates with access to a collection of law books. *See Kendrick v. Bland,* 586 F.Supp. 1536, 1549 (W.D.Ky. 1984); *Glover v. Johnson,* 478 F.Supp. 1075, 1096 (E.D.Mich.1979); *see also Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851, 855 (9th Cir.1985) (indicating that an adequate law library under *Bounds* includes "inmate law clerks trained to assist inmates with legal problems"); *Battle v. Anderson,* 614 F.2d 251, 255–56 (10th Cir.1980) (indicating that an adequate supply of law books combined with access to writ writers and inmate law clerks may suffice under *Bounds*); *Cody v. Hillard,* 599 F.Supp. 1025, 1060–61 (D.S.D.1984) (following *Glover*), *aff'd,* 799 F.2d 447 (8th Cir.1986), *reh'g granted,* Oct. 28, 1986. In a follow-up on the Supreme Court's deci-

sion in *Bounds* itself, moreover, the Court of Appeals for the Fourth Circuit recently upheld a district court's finding that the State of North Carolina had failed to provide an adequate law library for inmates because, in part, it had not implemented a program for "the training and placement of ... inmate paralegals." *Smith v. Bounds,* 813 F.2d 1299, 1302 (4th Cir.1987).

■ From its analysis of the published case law the Court has concluded that a State seeking to satisfy its obligation under *Bounds* generally must provide a program of access that satisfies two criteria. First, the program must provide some source of legal information, whether in the form of an adequately stocked law library, attorneys, or some combination of the two, to all inmates. Secondly, "for those inmates who possess insufficient intellectual or educational abilities to permit reasonable comprehension of their legal claims, provision must be made to allow them to communicate with someone who, after consultation with the legal learning source, is capable of translating their complaints into an understandable presentation." *Kendrick,* 586 F.Supp. at 1549; *see Glover,* 478 F.Supp. at 1096. This analysis is consistent with the Supreme Court's opinion in *Bounds,* in which the Court indicated a State may be required to provide some additional assistance to inmates who are unable to perform legal research on their own. *Bounds,* 430 U.S. at 823–24 & 826, 97 S.Ct. at 1495–96, 1497; *see also Wolff,* 418 U.S. at 577–80, 94 S.Ct. at 2985–86 (holding that States must allow inmates to assist each other in civil rights and habeas actions).

It is not inconsistent, moreover, with the Sixth Circuit's admonitions that a State is required only to provide either an adequate law library or trained legal assistance. *See Penland v. Warren County Jail,* 759 F.2d 524, 531–32 & 531 n. 7 (6th Cir.1985) (*en banc*). A State that provides an inmate with access to an adequate law library is not obligated to provide that inmate with a professionally trained assistant to conduct his legal research, draft his complaint, and try his case. *See Hooks,* 775 F.2d at 1437–38. Simply holding that an inmate is not

entitled to both an adequate law library and access to an attorney does not, however, resolve the issue of whether a State must provide at least a minimal amount of assistance—for example, inmate law clerks or paralegals who can assist an inmate in his research and explain to him how to file a competent complaint or how to respond to a motion to dismiss or a motion for summary judgment—to inmates who because of illiteracy or similar intellectual or educational handicaps simply cannot use a law library without assistance. The Court believes that a fair reading of *Bounds* demonstrates that the Supreme Court expected that States would provide such assistance to inmates who need it: the assistance, if needed, would be one component of an adequate law library.

Nevertheless, in deciding an access to courts claim a court must evaluate the State's system as a whole. If inmates have adequate access to the courts under the State's system, then the system, or plan, is not unconstitutional simply because it does not satisfy the two criteria stated above. As the Sixth Circuit has held, "[w]e are concerned with a right of access *to the courts,* not necessarily to a prison law library." *Walker,* 771 F.2d at 932 (emphasis in original). Inmates are not entitled to "some minimum amount of time in the prison law library"; they bear the initial burden, rather, of demonstrating that the State's system has impeded their access to the courts. *Id.; see also Childs v. Pellegrin,* 822 F.2d 1382, 1384–85 (6th Cir.1987) (sufficient access was provided where the inmate appeared before the trial court, which questioned him carefully about his claim); *Hossman v. Spradlin,* 812 F.2d 1019, 1021 (7th Cir.1987) (States are required to provide inmates "that quantum of access to prison libraries—not total or unlimited access—which will enable them to research the law and determine what facts may be necessary to state a cause of action"); *Cepulonis,* 732 F.2d at 3 & 5 (access is denied if inmates have inadequate time to conduct legal research).

Once the inmates have established a *prima facie* case that they have been denied access to the courts, however, the burden shifts to the State to establish that its system or plan of access is constitutionally adequate under *Bounds. Smith,* 813 F.2d at 1302; *Campbell,* 787 F.2d at 225–26; *Rich v. Zitnay,* 644 F.2d 41, 43 (1st Cir.1981). Some courts have indicated that plaintiffs can establish a *prima facie* case simply by demonstrating that they have inadequate access to a law library. *See Cepulonis,* 732 F.2d at 4; *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1403 & 1413 (N.D.Cal. 984), *aff'd in relevant part,* 801 F.2d 1080 (9th Cir.1986); *Green v. Ferrell,* 801 F.2d 765, 772–73 (5th Cir.1986). Finally, in analyzing defendants' system the Court must consider that under *Bounds* a State is obligated only to assist inmates in "the preparation and filing of meaningful legal papers," *i.e.,* nonfrivolous complaints and petitions that meet all procedural prerequisites and adequate responses to motions to dismiss and motions for summary judgment. *Bounds,* 430 U.S. at 826 & 828, 97 S.Ct. at 1497, 1498. A State is not obligated to do anything more than assist inmates at the pleading stage. *Nordgren v. Milliken,* 762 F.2d 851, 854–55 (10th Cir.1985), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985); *see Mann v. Smith,* 796 F.2d 79, 84–85 (5th Cir.1986).

### The Constitutional Adequacy of Defendants' System

The first issue the Court must decide in evaluating the adequacy of defendants' system is whether plaintiffs have met their initial, *prima facie,* burden of establishing that the system is inadequate in any respect. In accordance with its factual findings, the Court finds that they have. The Court concludes, and holds, that defendants' present system denies inmates appropriate, *i.e.,* adequate, effective, and meaningful, access to the courts. Defendants' statistics, see defs. exhs. 304, 383, & 387, demonstrate that the plaintiffs, as a class, have access to the courts in the sense that they are able to file complaints and petitions for relief. The Supreme Court emphasized in *Bounds,* however, that States must assist inmates in the preparation and filing of nonfrivolous claims that meet all

procedural prerequisites, and in preparing responses to the State's arguments. *Bounds*, 430 U.S. at 826, 97 S.Ct. at 1497. Defendants' statistics do not demonstrate that inmates have adequate, effective, and meaningful access to the courts. A complaint or petition is not meaningful or adequate if it cannot survive a motion to dismiss on procedural grounds, *e.g.*, failure to exhaust state court remedies, lack of jurisdiction, or failure to name the proper parties, or if it fails to state a proper claim for relief.

An inmate also is denied meaningful access to the courts if he is unable to respond to a Magistrate's Report and Recommendation, or if he is unable to meet a court-established deadline for filing an amended complaint, or if he does not know he may be able to convince a court to reconsider a decision made because he had missed a deadline, simply because he is unable to gain access to a library or to use legal materials. As a district court judge who has reviewed and decided numerous prisoner complaints and petitions, I know that many inmates do not respond to Reports and Recommendations and court orders. Because of the evidence I considered in this case, I have a deeper appreciation of the difficulties inmates face in filing a meaningful complaint and in defending the validity of that complaint. More importantly, as I already have found, defendants' present plan for meeting their obligation under *Bounds* is inadequate, and because of the plan's inadequacies inmates are being denied their constitutional right of access to the courts.

The inadequacies of defendants' plan vary somewhat depending on the inmate population group. The general population inmates, who have direct personal access to the main law libraries, must deal with four inadequacies in defendants' system. First, the main law libraries do not contain certain materials that an inmate needs to file a meaningful complaint. Spe-

cifically, all of the main law libraries should contain a complete set of the Wright and Miller treatise on Federal Practice and Procedure; a set of Michigan civil jury instructions; the local court rules for the state courts (if they have any) and for the federal courts; and an up-to-date habeas corpus treatise. Secondly, at the Michigan Reformatory defendants should conduct regular and effective inventories of the law libraries. I find that the present inventories are inadequate to ensure that all of the required books are available to the inmates, and that the inventory in the record indicates that significant portions of the collection are missing. Thirdly, the MBP main law library must expand the amount of duplicate materials it carries so that it can service the inmates properly. I conclude, as a matter of law, that inmates have been denied meaningful access to the courts at the MBP because they have been unable to secure necessary law books. Fourthly, and finally, defendants are denying inmates their constitutional right of access to the courts by failing to provide assistance to those general population inmates who are unable to use the law libraries effectively. As I have found, inmates cannot secure meaningful assistance from either staff or other inmates. I reiterate that I am not requiring defendants to provide trained attorneys to assist inmates who have access to an adequate collection of law books. They are required, however, to provide some kind of research and other preliminary assistance to inmates who need it.

The situation of inmates who are confined to administrative segregation, protective custody, and certain minimum security areas, and consequently have little or no direct access to the main law libraries, is even more critical.[1] Defendants attempt to satisfy their obligation under *Bounds* by providing these inmates with access to "mini-law libraries" and the opportunity to request books from the main law libraries. I already have found, as a factual matter,

---

1. Also critical is the situation of those inmates who receive reports and recommendations or motions while they are in transit between institutions. They have absolutely no access to a law library or any other source of legal infor-

mation for assistance in preparing an effective response. In addition, many inmates either lose their personal legal materials during these transitions or have to wait a considerable period of time before regaining possession of them.

that this system is inadequate, and now hold, in agreement with several other courts, that this system is unconstitutional as well. *See Toussaint*, 801 F.2d at 1109–1110; *Green*, 801 F.2d at 772; *Williams v. Lane*, 646 F.Supp. 1379, 1389 & 1407 (N.D. Ill.1986); *Canterino v. Wilson*, 562 F.Supp. 106, 110 (W.D.Ky.1983). Defendants may well have legitimate security reasons for not allowing these inmates access to the main law libraries, although they produced no evidence of such reasons at trial, and an inmate is not entitled to unrestricted access to the law library on his own terms. *See Grossman*, 812 F.2d at 1021; *Campbell*, 787 F.2d at 227–29. Defendants, however, still must satisfy their obligation under *Bounds*. If they do not wish to provide adequate law libraries for these inmates, *i.e.*, access to an adequate collection of law books and minimal legal assistance to those inmates who need it, they must provide them with access to legally trained personnel. *See Toussaint*, 801 F.2d at 1109–10; *Cepulonis*, 732 F.2d at 4–5; *Holt*, 702 F.2d at 640. I hold that by failing to provide these inmates with access either to an adequate law library or to adequately trained legal assistance, defendants are violating the requirements of *Bounds* and plaintiffs' right of access to the courts. I further hold that even absent any proof of harm to these inmates (I find, however, that there is harm), defendants' system on its face is constitutionally inadequate. No person, not even a trained attorney, can prepare an effective complaint without adequate access to law books.

In accordance with the above discussion, the Court will require defendants to prepare a plan to remedy the defects in their current law library system. This plan shall address the following issues: (1) supplementing the main law library collections; (2) ensuring that the MR conducts regular and effective inventories of its law library collections; (3) providing some research and explanatory assistance to inmates who use the main law libraries; and (4) providing either direct access to legal assistance or direct access to adequate law libraries, including access to both law books and assistance for inmates who require it, for inmates who presently do not have direct access to the main law libraries. Defendants shall have sixty (60) days from the date of this opinion to submit their plan. Plaintiffs then shall have thirty (30) days to respond to the plan. The Court thereafter will enter a final injunctive order requiring defendants to implement an appropriate remedial plan. It would greatly assist the Court, of course, and would facilitate the entry of a final order, if the parties could agree on an appropriate remedial order.

## V. *Plaintiffs' Racial Discrimination Claim*

Plaintiffs' final claim is that defendants are discriminating against black inmates on the basis of their race. This claim is contained in one paragraph of plaintiffs' first amended complaint.

55. Although a majority of the inmates are black, disproportionately few staff members are black. Certain desireable inmates jobs are disproportionately assigned to white inmates. Cafeteria serving lines are generally segregated by race. Black inmates are assigned to punitive segregation in disproportionate numbers; white inmates are assigned to protective custody in disproportionate numbers. Certain white staff display attitudes of racially motivated hostility to black inmates. Racial tension contributes to the atmosphere of violence at the prisons.

First Amended Complaint ¶ 55. At trial, plaintiffs introduced evidence suggesting that white inmates are disproportionately assigned to protective custody; that black inmates are disproportionately assigned to administrative segregation and punitive detention or segregation; that some correctional officers subject black inmates to racial harassment in the form of racial slurs and other kinds of racially oriented misconduct; that the subject institutions' dining halls are racially segregated; and that black inmates are discriminated against in the employment process. I first will analyze the legal standards I must apply in deciding plaintiffs' claims. I then will discuss and decide each claim separately. In

deciding these claims, I have considered not only the parties' post-trial submissions, but also the materials they submitted on defendants' Rule 41(b) motion and plaintiffs' supplemental pretrial brief on this issue. Before addressing the merits of plaintiffs' claims, however, I will resolve three evidentiary disputes and will decide defendants' renewed motion to decertify the class on this claim.

The first evidentiary matter to resolve is defendants' May 7, 1987 motion to strike the testimony of Dr. Ronald Christensen, plaintiffs' statistics expert, which was given on June 3rd, 4th, and 5th, 1986. The impetus for defendants' motion was the Court's decision to exclude part of the testimony of their racial discrimination expert, Camille Camp, because they had not provided plaintiffs with sufficient notice of the statistical data underlying Ms. Camp's proposed testimony. See 4–24–87 T at 45–69. They advance two grounds in support of their motion. First, they argue that the Court erred in striking Ms. Camp's testimony and that "it is manifest and unfair to apply the rigorous standards to exclude the important testimony of Defendants' experts while allowing the testimony of Plaintiffs' expert to stand." Motion to Strike at 4–5. Secondly, defendants argue that plaintiffs similarly did not give them advance notice of the statistical data underlying Dr. Christensen's testimony. *See* Affidavit of David G. Edick. Plaintiffs urge the Court to deny defendants' motion, arguing that with two minor exceptions they complied fully with the Court's pretrial order and order scheduling events in supplying defendants with Dr. Christensen's data and that defendants could have recalled Dr. Christensen for further cross-examination.

 I will deny defendants' motion for two reasons. First, I reject defendants' attempt to reargue the merits of my ruling on Ms. Camp. Defendants cited none of the cases they discuss in their motion when they asked me on April 27th to reconsider my decision, despite having had the weekend to research the issue. 4–27–87 T at 235–36. It is too late now for defendants again to ask me to reconsider my ruling. Secondly, the situations regarding Dr. Christensen and Ms. Camp are dissimilar in two significant respects. In the first place, with some minor exceptions, it appears that plaintiffs complied with the order scheduling events and the pretrial order in supplying Dr. Christensen's data to the defendants. In the second place, I indicated at trial that defendants could request permission to recall Dr. Christensen for further cross-examination if they needed additional preparation time. T at 122–24 & 297. I do not believe defendants ever requested permission to cross-examine Dr. Christensen further. The Court's indications, if any, that defendants could respond to Dr. Christensen's testimony with rebuttal evidence rather than cross-examination did not, of course, excuse them from complying with the Court's orders and a fundamental standard of fairness in presenting their testimony. The Court appreciates the significance of Ms. Camp's proposed testimony. I see no reason, however, either to reconsider my decision on that testimony or to strike Dr. Christensen's testimony, and therefore deny defendants' motion.

The second evidentiary dispute concerns Mr. Chapman's testimony. At the Court's request, the parties videotaped Mr. Chapman's testimony on November 6, 1986 in Washington, D.C. I have reviewed portions of the videotape and the entire transcript of Mr. Chapman's testimony. I have ruled on the objections made during his testimony and on the exhibits plaintiffs sought to introduce through him. Those rulings can be found in footnote two to this opinion.[2]

**2.** The Court makes the following rulings on the evidentiary objections made during Mr. Chapman's testimony. The objections are listed by page number: 23—overruled; 24–25—overruled; 26—overruled; 28—overruled; 30–31—overruled; 31–34—overruled; 37–38—overruled; 38—overruled; 39—overruled; 40—overruled; 41—sustained; 56—overruled; 59–60—overruled; 60–62—overruled; 66—overruled as being moot; 72–73—overruled; 77—overruled; 78–82—overruled, but the answer on page 82 is limited to the obvious, *i.e.,* that defendants' rejection of racial slur grievances tends to discourage inmates from filing such grievances; the evidence does not suggest that this situation exacerbates the treatment of black inmates; de-

The third evidentiary matter concerns whether the Court should grant preclusive effect to the results of major misconduct and administrative segregation hearings within the Michigan prison system. In other words, defendants argue that because these hearings are quasi-judicial in nature, plaintiffs cannot now argue that they are infected with racial discrimination and cannot challenge the results of the hearings on that basis. *See University of Tennessee v. Elliot,* —— U.S. ——, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). Plaintiffs disagree, and request the Court to rule that they "are not precluded from presenting evidence that the results of disciplinary or reclassification hearings are the product of racial discrimination." Plaintiffs' Memorandum at 7.

The Court declines to decide this issue for two reasons. First, I do not believe plaintiffs are challenging the major misconduct or administrative segregation (reclassification) hearings themselves as being racially motivated. Their argument, rather, is that due to racial discrimination black inmates receive a disproportionate number of major misconduct tickets and hence are disproportionately assigned to punitive detention and administrative segregation. I disagree in particular with defendants'

statement that "all grievances which were precipitated by the receipt of a major misconduct ticket ... amount to a collateral attack on the major misconduct hearing report." Defendant's Brief at 7. That the inmate may properly have been found guilty of the charge does not address the issue of whether the ticketing officer was racially motivated.

Secondly, the evidence suggests that racial discrimination is not a defense to a major misconduct ticket or a proper issue to be raised in a reclassification hearing. To the extent, then, that plaintiffs are challenging the outcomes of the major misconduct and administrative segregation hearings, they are entitled to do so because defendants have not established that the issue of racial discrimination can be raised and decided in those hearings, and thus have not properly raised the issue of whether the Court should give the hearings' outcomes preclusive effect. For the above reasons, the Court finds that it need not decide whether it should grant preclusive effect to the outcomes of defendants' major misconduct and administrative segregation hearings.

During trial, defendants again requested the Court to decertify the plaintiff

---

fendants' motion to strike the answer is denied; 86—sustained; the answer is not tied to evidence of racial motivation; it could be admissible if it were linked up; 87—sustained; there is no evidence that racially motivated correctional officers issued the tickets; 92—sustained; there is no evidence that Meyers, Bills, and Pringle knew each other; there is no foundation for the perception of unequal treatment; 95–96—sustained; the answer assumes that Sullivan's statement and reason for wanting to be in detention are true; 116–18—overruled; the objection is untimely and the opinion is within the expert's knowledge based on statistics, interviews, tours, and evidence presented to him; 130–31—overruled; questions regarding background and prejudices are proper; 131—overruled; 133—sustained; irrelevant; 134—sustained; irrelevant; 136—overruled; 142–43—sustained; the question on religious beliefs is improper; 145–46—sustained unless it is established that the quotation came from Myrdal; 150–51—sustained; the witness cannot opine about a study he does not know about; 151–54—sustained for the same reason; 154—overruled; 156–57—overruled; 158–59—sustained; the Court is not interested on the witness' "surprise"; 160–61—

overruled; the witness is familiar with the study; 168—sustained; compound question; 171—overruled; untimely; 171–74—moot; the question was not answered; 176—overruled; 177—overruled; 180—overruled; 181—overruled; 188—overruled; 189—sustained; the exhibit is not in evidence; 190—sustained for the same reason; 192–93—sustained for the same reason; 195–98—most of the question was not answered; the objection is sustained because the document is not in evidence and was not on defendants' exhibit list; 210—overruled; 214—overruled.

In addition to these rulings, the Court will allow in the following exhibits: (1) exhibit 421 is admitted as evidence on which a race relations expert can rely. The staff response to the racial complaint can assist the expert in evaluating staff responses to inmate racial complaints. The Court will ignore the sex discrimination aspect of the complaint. The exhibit is admitted to give the witness another source of information for his opinion on whether racial grievances are useless. It is not admitted as substantive evidence of discrimination. (2) 477e and 477f are admitted over defendants' objections. (3) 576 and 793 are admitted.

class on the issue of racial discrimination. T at 480–81. The Court reserved ruling on defendants' motion until the end of trial. *Id.* at 528–29. The parties have filed post-trial briefs on defendants' motion, which the Court repeatedly has denied in the past because defendants could not establish that there exists an intra-class conflict or genuine antagonism between the white inmates and the black inmates such that plaintiffs' attorneys cannot adequately represent the entire class on the racial discrimination issue. See Opinion of July 15, 1986; Opinion of August 29, 1985. The Court has reviewed the parties' submissions, the evidence in the record, and the relevant cases. To the extent that defendants are requesting the Court to decertify the plaintiff class on the claims discussed in plaintiffs' May 27, 1986 Pre-Trial Brief, *i.e.*, that due to intentional racial discrimination "the large majority of prisoners in administrative and punitive segregation are Black, while the large majority of those in protective custody are Caucasian" and "the highest job levels and most desirable jobs are filled disproportionately by Caucasian prisoners, while the majority of Black prisoners are relegated to less prestigious jobs," the Court denies their motion. On these issues, I adhere to my earlier ruling that plaintiffs can adequately represent the interests of both black inmates and white inmates because "if Defendants' practices and policies are racially discriminatory, both black and white inmates are the victims of the resultant racial tensions in the prisons" and "have a common interest in alleviating these conditions." Opinion of Aug. 29, 1985 at 6.

The Court in particular finds defendants' arguments regarding protective custody, administrative segregation, and punitive detention to be specious. Plaintiffs never have suggested that defendants should maintain a racial balance in any of these housing areas; they merely argue that defendants should cease their alleged practice of assigning inmates to these areas on the basis of their race. With regard to plaintiffs' employment discrimination claim, as defined above, there is no evidence in the record indicating that to grant relief on this claim would impair any legitimate interests of the white inmates. *See Social Services Union v. County of Santa Clara,* 609 F.2d 944, 948 (9th Cir.1979). The issue is a close one. Given that the named plaintiffs consist of both black inmates and white inmates, and given the particularly damaging effects of racial discrimination in a closed prison environment, however, the Court will adhere to its prior decisions on this issue.

Shortly before the start of trial, though, plaintiffs altered their racial discrimination in employment claim. For the first time, they argued that defendants' "anti-discrimination" policy, PD–DWA–64.01, is unconstitutional because it sets a ceiling on minority employment. See Response to Defendants' First Motion in Limine at 9. Although the trial transcript may not reflect my feelings, I was bemused by the seeming discrepancy between plaintiffs' pre-trial brief and their response to defendants' first motion in limine. Plaintiffs did not attack defendants' policy in their pre-trial brief, arguing instead that "racially stereotypic attitudes on the part of a majority Caucasian staff have led to disproportionate overrepresentation of Black prisoners ... in lower levels of jobs and the least desirable jobs." Pre-Trial Brief at 8. Nor did they attack it in their May 16, 1986 Proposed Findings of Fact and Conclusions of Law. In a supplemental brief filed during the trial, however, plaintiffs argued that defendants' policy "requires job discrimination against Black job applicants whenever Blacks already comprise an arbitrarily determined percentage of existing employment in a particular job category." Supplemental Brief on the Issue of Racial Discrimination at 1. They endorsed the policy, though, "insofar as it sets a floor for Black employment," believing that such a floor "is mandated based on defendants' past history of discrimination" against black inmates. *Id.* at 8.

■ I allowed plaintiffs to proceed with this claim because, as I already have indicated, I was not sure where plaintiffs were going and defendants did not claim they were unduly prejudiced in having to defend

against it. Plaintiffs' post-trial brief clearly demonstrates, however, that the Court cannot allow the class to continue on the issue of the validity of defendants' "anti-discrimination" policy. In their brief, plaintiffs reiterate their argument that the policy places a ceiling on black employment, and contend that while past discrimination against black inmates justifies continuation of the policy as a floor on black employment, *i.e.,* as an affirmative action tool, it should not be used as a means of limiting black employment in any particular job category. They ask the Court to modify "defendants' current anti-discrimination policy to provide that the plus or minus 10% of Black prisoners representation in the population be a goal, not a ceiling, for all job assignments. After the defendants reach that goal for the entire system, race should not be a factor in job assignments; rather the assignments thereafter should be made solely on the basis of qualification at the time of making application." Plaintiffs' May 15, 1987 Trial Brief at 25. Plaintiffs argue in support of their position that "Black prisoners testified they were denied jobs because these jobs had been reserved for Caucasian prisoners"; that the policy is an affirmative action program; that evidence of defendants' past and present discrimination against black inmates "supports the development of the policy to protect the rights of Black prisoners" and "the continuation of a race conscious policy for the assignment of Black prisoners to jobs"; that "[t]he record contains no evidence of a like history of discrimination against Caucasian prisoners"; and that the policy "improperly serves as a race-conscious program to benefit Caucasian prisoners." *Id.* at 1–3.

It is clear from plaintiffs' arguments and the evidence they introduced at trial that on this issue the interests of the black inmates and the white inmates diverge. There is no evidence in the record to counter plaintiffs' request that the Court continue the policy as a floor on black inmate employment because neither of the parties had any reason to present such evidence. Like the plaintiffs, defendants want to continue the policy. See 4–27–87 T at 170–71.

No one at trial argued that the policy also should be maintained as a floor on the employment of white inmates who also may be denied employment because of the policy, or that the policy should not be continued as a floor on black inmate employment. Once plaintiffs brought defendants' policy into the case and began arguing that it should be continued as a floor on black inmate employment, the interests of the black inmates and the white inmates diverged. I do not believe plaintiffs' counsel can adequately represent the interests of the entire class on this specific issue and I find that the potential intra-class conflicts are too significant to allow the class to remain certified on it. *See Droughn v. FMC Corp.,* 74 F.R.D. 639, 643 (E.D.Pa. 1977). The Court accordingly grants defendants' motion in part and decertifies the plaintiff class to the extent that plaintiffs challenge defendants' anti-discrimination policy. *See General Telephone Co. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). I regret having to take this action. Given the clear intra-class conflict posed by plaintiffs' challenge to the policy, however, I have no choice. I will consider plaintiffs' employment discrimination claim on the issues raised in their pre-trial brief.

▆▆▆ Turning now to the merits of plaintiffs' claim, State prison officials, like all other government officers, are subject to the Fourteenth Amendment's prohibition of intentional or purposeful racial discrimination, except possibly for " 'the necessities of prison security and discipline.' " *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (*per curiam* ) (*quoting Lee v. Washington,* 390 U.S. 333, 334, 88 S.Ct. 994, 995, 19 L.Ed.2d 1212 (1968) (Black, J., concurring)). They cannot discriminate on the basis of race in inmate housing, *McClelland v. Sigler,* 456 F.2d 1266, 1267 (8th Cir.1972); *United States v. Wyandotte County,* 480 F.2d 969, 970 (10th Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973); in inmate discipline, *Finney v. Arkansas Board of Corrections,* 505 F.2d 194, 209–10 (8th Cir. 1974); *McCray v. Bennett,* 467 F.Supp.

187, 195–96 (M.D.Ala.1978), or in inmate employment. *Gates v. Collier*, 349 F.Supp. 881, 887 & 901 (N.D.Miss.1972), *aff'd*, 501 F.2d 1291 (5th Cir.1974); *Battle v. Anderson*, 376 F.Supp. 402, 410–11 & 421 (E.D.Okla.1974). Prison officials cannot, moreover, justify racial discrimination by reference to vague fears of inmate violence if racial segregation is not continued. *Wyandotte County*, 480 F.2d at 971–72; *Mickens v. Winston*, 462 F.Supp. 910, 911–12 (E.D.Va.1978), *aff'd mem.*, 609 F.2d 508 (4th Cir.1979). They have an affirmative duty, rather, "to remedy unlawful practices." *Blevins v. Brew*, 593 F.Supp. 245, 248 (W.D.Wisc.1984). If inmates can establish that "discriminatory purpose [is] a motivating factor" in any of the decisions made by prison officials, then the officials must prove "that the same decision would have resulted even had the impermissible purpose not been considered." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 & n. 21, 97 S.Ct. 555, 556 n. 21, 50 L.Ed.2d 450 (1977). With these standards in mind, I turn to plaintiffs' claims.

I begin by addressing plaintiffs' claim that white inmates are disproportionately assigned to protective custody and that black inmates are unable to get into protective custody. Plaintiffs presented two kinds of evidence in support of this claim. First, they presented statistical evidence, which was statistically significant, demonstrating that although blacks constitute a majority of the inmate population in the subject institutions, a majority or other disproportionate percentage of the inmates in protective custody are white. T at 277–79; pls. exhs. 510–D, 510–F, 510–H, & 521–M; *see* pls. exhs. 47 at 11 & 48 at 20. Secondly, they presented evidence suggesting that the MR staff person responsible for assigning inmates to protective custody may have a stereotypic view of black inmates, believing them to be streetwise and violence prone and hence not in need of protective custody, T at 35–36 & 112–13; that a couple of inmates may have received racially disparate treatment regarding assignment to protective custody, T at 3084–85; T at 3073 & 3086; T at 1364–67; pls. exhs.

460–C, 460–L, & 648–A; T at 2315–16; and that one black who did get into protective custody at the MR was subsequently subjected to racially discriminatory treatment that led him to request reassignment to the general population. T at 3070–73.

■ The Court finds that black inmates are not intentionally discriminated against on a class-wide basis in terms of placement in protective custody, and will deny plaintiffs' claim for relief on that ground, for several reasons. Plaintiffs' statistical evidence does not, by itself, support a finding that defendants intentionally discriminate against black inmates in this area. Although the statistical disparities are significant, they are not the kind of "clear pattern, unexplainable on grounds other than race," that would support an equal protection claim. *See Village of Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564. Plaintiffs failed to provide sufficient supporting evidence to establish that the statistical disparities are the product of intentional racial discrimination against black inmates. A few, unrebutted, incidents of apparent discrimination, spread over the approximately four-year time frame of this lawsuit, simply do not provide a sufficient basis for this Court to infer a racially discriminatory intent and to impose class-wide liability on the defendants. This is true even though all of the incidents occurred at the MR and even if I accept plaintiffs' assessment of Deputy Adams' attitude toward black inmates. Plaintiffs, moreover, produced evidence of only one black inmate who had requested, but been denied, placement in protective custody. T at 1366–67. Although this incident, and the other incidents of apparent racially discriminatory treatment to which inmates testified at trial, was regrettable, it does not justify granting plaintiffs the class-wide relief they seek. Finally, the Court found credible defendants' testimony that their official policy is that all inmates are put in protective custody upon request. 3–16–87 T at 86–87.

Plaintiffs' next claim is that black inmates are discriminatorily assigned to administrative segregation and punitive de-

tention/segregation. Again, they seek to support their claim with a combination of statistical data indicating there is a statistically significant disproportionate number of black inmates in administrative segregation and punitive detention, and testimonial and documentary evidence suggesting that this disproportionality is the result of intentional racially discriminatory treatment of black inmates. With regard to the latter prong of their proof, plaintiffs request the Court to conclude that black inmates live in a racially tense atmosphere punctuated by racial disturbances, racial slurs and other racially demeaning behavior by white staff members that provoke black inmates, and disparate ticketing of white and black inmates for violating institutional rules. They also request the Court to find that approximately fifty (50%) percent of the placements in administrative segregation are triggered by tickets for non-assaultive offenses; that non-assaultive offenses are subjective, and thus subject to the whims and prejudices of individual correctional officers; that black inmates receive a disproportionate number of non-assaultive misconduct tickets, in particular tickets for insolence; and that the overwhelmingly white correctional staff, particularly at the MBP, hold racially stereotypic views of black inmates—which they are in part taught at the new employee training school—that lead them to treat black inmates differently than white inmates in the disciplinary process.

Plaintiffs' claim and evidence presents a difficult issue for the Court to decide. Their statistical evidence, which defendants for the most part did not rebut, evinces a disturbing pattern of disproportionate assignments of black inmates to punitive detention, and frequently subsequently to administrative segregation. Under Michigan's disciplinary system, a correctional officer can ticket an inmate for violating institutional rules. The tickets can be either for major misconduct or for minor misconduct. See pls. exh. 404–A at 2–2h. If the ticket be for major misconduct, the inmate faces some rather severe penalties and is entitled to a hearing before a hearing officer, who is an attorney not subject to the direct control of correctional officials. See M.C.L. 791.251–.252; 3–16–87 T at 88. The hearing officer determines whether the inmate is guilty of the charged offense and determines the punishment if he finds the inmate guilty. See M.C.L. 791.252(k); defs. exh. 101.

A major misconduct charge, moreover, may lead to the inmate being placed in administrative segregation. Inmates are placed in administrative segregation if a prison security classification committee determines that "they cannot be managed with general group privileges because they need protection, are escape risks or their behavior is a serious threat to property, themselves, staff, fellow prisoners or the safety and security of the facility." *Id.* This reclassification process apparently is outlined in two administrative rules, rule 791.4405 and rule 791.3315, see defs. exh. 42, which the parties, for whatever reason, failed to introduce into evidence. Even without the benefit of these rules, however, the Court can find that inmates who receive major misconduct tickets face placement in punitive segregation, pursuant to a finding of guilt and a determination of punishment by the hearing officer, and reclassification to administrative segregation, pursuant to a determination by the security classification committee.

I also find that plaintiffs do not allege that the hearing officers themselves are racially motivated, and I specifically find that there is no evidence in the record to support such a contention. See Chapman T. at 202. I further find that with the possible exception of one or two persons, plaintiffs do not allege that the security classification committees are racially biased toward black inmates, and I specifically find that there is insufficient evidence to conclude that the committees intentionally discriminate against black inmates in placing inmates in administrative segregation. At best, plaintiffs have suggested that the Deputy Warden at the MR may harbor a stereotypic view about black inmates that may affect his decisions on whether to assign inmates to administrative segregation. Even then, plaintiffs have not established

that he has ever intentionally discriminated against a black inmate in placing him in administrative segregation. *Cf.* T at 271; pls. exh. 510–G (disproportionate number of black inmates in administrative segregation at the MR is not statistically significant). Moreover, even were I to accept plaintiffs' view that actions taken pursuant to "preconceived ideas and often unconscious prejudices" can constitute intentional discrimination, *see Finney,* 505 F.2d at 209; *see generally* Lawrence, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism,* 39 Stan.L.Rev. 317 (1987), they have not demonstrated by specific evidence that any person on a security classification committee who may hold a racially stereotypic view of black inmates has, because of that view, disproportionately assigned them to administrative segregation.

Plaintiffs rest their case, rather, on the ticketing practices of correctional officers. They have introduced evidence indicating that certain correctional officers harbor racial biases against black inmates; that black inmates occasionally are given tickets for reacting violently to racial slurs from correctional officers; that certain correctional officers ticket black inmates while ignoring the similar conduct of white inmates; that black inmates receive a disproportionate number of major misconduct tickets for non-assaultive offenses, which tend to be subjective; and that the overwhelmingly white correctional staff may harbor stereotypic views about black inmates that may lead them to discriminate against them. Plaintiffs further contend that this disparate ticketing constitutes an informal policy or practice for which the Court can hold the Department of Corrections responsible because the Department implicitly or explicitly encourages such treatment by ignoring inmate grievances of racially discriminatory treatment; not disciplining staff for engaging in racially discriminatory behavior; improperly rejecting inmate grievances of racial discrimination related to the major misconduct hearing process; maintaining an ineffective affirm-

ative action plan for hiring black staff; and maintaining an ineffective program for preparing new employees to interact with black inmates.

In evaluating plaintiffs' claim, the Court must consider "the totality of the relevant facts." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). "Determining whether invidious discriminatory purpose was [or is] a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564. In making this inquiry, the Court should consider, among other factors, whether defendants' actions adversely affect one race more than the other; any prior history of discriminatory practices; the opportunity for discretion to enter into the decision-making process; and any other evidence reflecting the intent of the relevant decision-makers. *Id.* at 266–67, 97 S.Ct. at 564; *McCray,* 467 F.Supp. at 195–96.

As I have opined, plaintiffs' statistical evidence of disproportionate placement of black inmates in administrative segregation and punitive segregation is disturbing and significant. I find as a factual matter that a significant percentage of the major misconduct tickets that can lead to placement in administrative segregation are given for non-assaultive offenses that tend to depend on the discretion of the ticketing officer, pls. exh. 711; that black inmates tend to receive more major misconduct tickets, and in particular more tickets for insolence, than white inmates, pls. exhs. 521–S & 521–T [3]; that the disproportionate number of black inmates confined to administrative segregation at the SPSM and the MBP is statistically significant, T at 268, 270, & 275–76; pls. exhs. 510–C & 510–E; that the disproportionate number of black inmates confined to punitive segregation at the SPSM and the MR is statistically significant, T at 271–72 & 276; pls. exhs. 510–C & 510–G; and that black inmates tend to receive a disproportionate number of non-as-

---

**3.** The Court discounts the significance of these two exhibits slightly because it agrees with de-

fendants that the statistics would be more significant if they were broken out by institution.

saultive major misconduct tickets. Chapman T at 85–86 (threatening behavior, disobeying a direct order, and insolence).

I further find that certain correctional officers are racially biased against black inmates, as evinced by their use of racial slurs and other inappropriate racially motivated behavior. *See, e.g.,* T at 960–62 ("burrheads, rugheads, or walking brillo head"), 969–70 ("take your black ass upstairs"), & 972–73 ("smart ass nigger," "half breed"); T at 984–85 (Bojangles tap dance routine); T at 1178 ("jungle bunny, black bastard, black nigger); T at 1276–77 ("niggers, black son-of-a-b's, black m.f.'s"); T at 1374–75 ("nigger this, nigger this, your nigger mammy"); T at 1464 ("these black niggers from Detroit"); T at 1518–19; T at 1809 ("you niggers are all alike"); T at 1854 ("I will kill you, nigger"); T at 1979 ("niggers"); T at 2055–56 ("niggers"); T at 2152–53 ("ex-slaves"); T at 2245–47 (officer yelled insults to inmates over the loudspeaker); and T at 2258–61 ("half-breed, half white boy, half nigger"). This is just a partial listing of the credible testimony I heard on the use of racial slurs and other inappropriate behavior by certain correctional staff. Defendants, moreover, did not attempt to rebut this testimony even though the inmate witnesses specifically named several guards that had engaged in such behavior.

I also find that certain correctional staff occasionally ticket black inmates for acts of misconduct while ignoring similar action by white inmates. *See, e.g.,* T at 1180; T at 1272–74; T at 1468–71; and T at 3203–05. Finally, I find that inmates occasionally are given tickets for reacting violently, with words or physical conduct, to racial slurs and other racially derogatory conduct by staff members. See T at 1278–79; T at

1462–63; T at 1915; T at 2135–36; T at 2809–10; & T at 3185–86.

The evidence does not, however, demonstrate that the correctional staff in general intentionally discriminates against black inmates in handing out major misconduct tickets or that the white correctional staff as a whole, or even a majority of the staff, harbor stereotypic views about black inmates that lead them to discriminate against them in handing out tickets. I also do not find that the Department, acting through the named defendants and others with policy-making authority, implicitly or explicitly approves, condones, ratifies, or supports whatever incidents of racially discriminatory ticketing may occur. The evidence does not show that defendants implicitly condone or encourage the issuance of racially motivated tickets by failing to take action to prevent such activity. The evidence also does not demonstrate that defendants' new employee training materials are linked to this problem. Even if I accept Mr. Chapman's testimony on the materials, plaintiffs have not linked the training the new employees receive to incidents of discriminatory ticketing.

■■ Based on the evidence before me, I conclude that plaintiffs have not established by a preponderance of the evidence that defendants intentionally discriminate against black inmates in either the administrative segregation or the punitive segregation process.[4] An intent to discriminate against black inmates is not, on a classwide basis, a motivating factor in defendants' actions. I reach this conclusion primarily for five reasons: (1) Plaintiffs' statistical evidence, although significant both statistically and as evidence of discriminatory intent, does not by itself support a finding of discriminatory intent. (2) As I already have found, plaintiffs produced lit-

---

**4.** I observe that according to defendants' posttrial memorandum regarding race discrimination, they do "generally assign prisoners to segregation on the basis of race." Memorandum at 3. This statement unfortunately is but one example of the many errors defendants have made in their written submissions throughout this case. *See also id.* at 9 ("Obviously, Defendants cannot withdraw to bigger reach of the 9,000 employees in the Department of Corrections at all times, but, fails to establish that there is a pattern and practice of racial derogatory remarks which Defendants have chosen to ignore"). These errors, which include not only typographical errors but also sentences and even entire paragraphs that are completely nonsensical, have sorely taxed the Court's patience and have made it difficult to understand defendants' arguments.

tle or no evidence that the hearing officers intentionally discriminate against black inmates, although Dr. Christensen did testify that black inmates tend to receive longer sentences than white inmates. T at 302–03. (3) Also as I have already found, plaintiffs produced little or no evidence that the members of the security classification committees intentionally discriminate against black inmates. Defendants' exhibit 101 suggests, moreover, that the committees consider more than simply whether the inmate has received a major misconduct ticket in deciding whether to place him in administrative segregation. See also 3–16–87 T at 84. (4) Plaintiffs simply have not established that black inmates, as a class, are subjected to racially motivated major misconduct ticketing practices. They produced evidence that certain correctional officers are racially biased, but did not establish that these officers disproportionately ticket black inmates as compared to white inmates. They also produced evidence of scattered incidences of discriminatory ticketing, but again did not establish that these incidences are widespread. (5) Finally, I cannot conclude that whatever discrimination in the disciplinary process does occur results from a policy, practice, or custom, whether formal or informal, of the Department of Corrections. *See Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976).

This was a difficult issue for me to decide, as were the other racial discrimination issues, and I certainly do not intend by my opinion to exonerate the Department of Corrections entirely. Plaintiffs did not meet their burden of proof. I, however, found their evidence to be deeply disturbing. The Department, moreover, did not rebut plaintiffs' extensive testimony of individual incidents of racially discriminatory conduct by correctional officers and did not provide a rational explanation for the racial disparity in inmates confined in administrative segregation and punitive detention. Deputy Director Bolden's historical explanation was interesting, but vague and not supported by any evidence. See 3–16–87 T at 84–86. Thus, although the Court denies plaintiffs' request for relief and enters judgment for defendants on this issue, it certainly encourages defendants to explore the situation and to attempt to remedy whatever individual wrongs are occurring.

Plaintiffs also contend that defendants subject black inmates to racial harassment in the form of racial slurs. In the Court's February 27, 1987 opinion on defendants' Rule 41(b) motions, it considered the evidence on racial slurs as a separate ground for relief as well as evidence of defendants' discriminatory intent in assigning inmates to administrative segregation and punitive detention. Opinion of Feb. 27., 1987 at 21–22. Upon further consideration of plaintiffs' pleadings, the parties' written submissions, and the evidence produced at trial, the Court is not certain that plaintiffs intended to raise the use of racial slurs against black inmates as a separate ground for relief. I will decide the issue, however, for two reasons. First, plaintiffs presented substantial evidence on the use of racial slurs by correctional staff and defendants had an adequate opportunity to rebut that evidence. Secondly, the parties discuss the racial slur issue as a separate claim for relief in their written submissions. See Plaintiffs' September 17, 1986 Supplemental Brief on the Issue of Racial Discrimination at 16–19; Defendants' December 9, 1986 Motion for Involuntary Dismissal at 14–20; Plaintiffs' December 22, 1986 Brief in Response to Defendants' Motion to Dismiss at 5–6; Defendants' January 20, 1987 Reply to Plaintiffs' Brief at 4–8.

Although the courts are not in complete agreement on this issue, I believe that prison officials violate the Fourteenth Amendment rights of black inmates if they intentionally subject them to a pattern of racial harassment. The use of rough language in a prison context, even if such language offends the sensibilities of inmates, does not violate the Constitution. *See Burton v. Livingston*, 791 F.2d 97, 100 (8th Cir.1986). Even an occasional racial slur, unconnected to other acts of racial harassment or abuse, does not violate the Constitution. Prison officials do violate the Constitution, however, if they intentionally subject black inmates to a pattern of racial harassment.

*Cf. Bohen v. City of East Chicago,* 799 F.2d 1180, 1185–86 (7th Cir.1986) (holding that "[s]exual harassment of female employees by a state employer constitutes sex discrimination for purposes of the equal protection clause of the fourteenth amendment"). If the instances of racial harassment are sufficiently frequent so as to create an atmosphere of racial tension and hostility, then the equal protection clause is violated even if the harassment is not connected to other kinds of official action, such as a denial of employment or placement in administrative segregation. In considering such a claim on a class-wide basis, a court must consider the frequency of the acts of racial harassment; the need and justification, if any, for such actions; the degree of injury suffered by the inmates; and whether the actions were taken in good faith or "maliciously and sadistically for the sole purpose of causing harm." *See Burton,* 791 F.2d at 100. In addition, of course, the Court must consider whether any unconstitutional harassment that does exist reflects a policy, practice, or custom of the Department of Corrections.

I have already discussed the instances of racial slurs supported by the evidence in this case. I reiterate that the testimony quoted in this opinion is only a portion of the credible testimony I heard on the use of racial slurs, and other acts of racial harassment, by correctional staff. I further find that defendants have not contested the existence of this harassment, although they certainly contest that it is widespread or provides a basis for relief, and have not established any need or justification for it. The racial slurs, moreover, are not made in good faith but rather for the sole purpose of antagonizing black inmates and inflict emotional and psychological pain on the inmates. Finally, I find that the use of racial slurs is sufficiently frequent to support a claim for class-wide relief. I specifically do not find that most correctional staff engage in this kind of behavior. A sufficiently large number do, however, to expose black inmates to a constitutionally intolerable atmosphere of racial harassment.

This finding does not end my inquiry, though. There remains the issue of whether this atmosphere of racial harassment reflects a policy, practice, or custom of the Department of Corrections. Defendants argue vigorously that it does not. They observe that their official policy forbids employees from discriminating "on any racial, sexual, or ethnic basis"; defs. exh. 93; that they have a well-established inmate grievance procedure which allows inmates to file grievances alleging racial discrimination directly with the Central Office, see T at 138–54; *see also* defs. exh. 100 (establishing a Warden's Forum); that they have an active affirmative action policy for their employees, see defs. exhs. 87, 17, & 18; 3–18–87 T at 60–89; that they provide new employees with extensive training on human relations in a prison setting, see defs. exhs. 90, 124, & 128; and that they maintain an effective employee disciplinary system. *See* defs. exhs. 109, 110, & 319a. Plaintiffs respond that defendants' policies, while they look good on paper, are ineffective. In particular, they argue that the inmate grievance procedure and defendants' employee disciplinary policy fail to prevent the use of racial slurs and other forms of racial harassment.

On this issue, I find that plaintiffs have established that the racial harassment from which black inmates suffer because of racial slurs represents a policy, practice, or custom of the Department of Corrections. Plaintiffs presented an extremely strong case on this issue. Defendants acknowledged that their staff uses racial slurs, *see, e.g.,* 3–17–87 T At 4; 3–17–87 T at 142; 3–18–87 T at 33–34, but testified that they rarely, if ever, discipline staff members for engaging in racially discriminatory behavior. *See* 3–17–87 T at 142–43; 3–19–87 T at 13; 3–18–87 T at 34–35. The inmate grievance system is ineffective in rectifying the racial slur situation: defendants almost uniformly demand substantiation, accept the staff officer's denial, and reject the grievance. *See, e.g.,* 3–19–87 T at 13; pls. exhs. 204, 208, 223, 249, 252, 254, 525, 537–1, 548, 574, & 755; *see also* T at 2681–83 (SPSM Warden ignored inmate racial complaints). Even when an inmate

provides the names of inmate witnesses, the grievance may be rejected without an investigation of the inmates. *See* pls. exh. 258. Finally, and most egregiously, the Court heard repeated, credible, testimony about certain correctional officers who use racial slurs on a consistent basis, with no rebuttal from defendants or any attempt to show that such officers have been the subject of disciplinary action. *See, e.g.,* T at 1310, 1809, 2055–56, 2137, & 2590–91.

In light of this evidence, the Court must conclude that the Department of Corrections explicitly or implicitly authorizes, approves, or knowingly acquiesces in the unconstitutional harassment of black inmates by certain staff officers. *See Hays v. Jefferson County,* 668 F.2d at 874. The Sixth Circuit has indicated that notice alone of unconstitutional conduct is insufficient to establish supervisory or municipal liability. *Bellamy v. Bradley,* 729 F.2d at 421. A practice does constitute Departmental policy or custom, however, when high-level supervisory officials are aware it occurs and by their actions inform their subordinates they will take no action to prevent it. *Brandon v. Allen,* 645 F.Supp. 1261, 1269 (W.D.Tenn.1986) ("A practice is to be deemed an official custom ... if it occurs with sufficient frequency and notoriety as to make it known to responsible supervisory officials and those officials decline to take effective action to end that practice").

The Department is making some effort to address racial grievances as they arise, to maintain employee discipline, and to promote affirmative action programs within its work force. Mr. Chapman, moreover, (1) could not, in my opinion, offer any sound advice on how supervisory officials should react when a correctional officer denies making a racial slur and it is just his word against that of the inmate, Chapman T at 137–40; (2) approved of the Department using a former inmate to handle grievances at the third step, *id.* at 204; and (3) suggested only that defendants could improve the situation by investigating racial slur grievances more seriously and monitoring the grievances for patterns. *Id.* at 125. I cannot, however, accept defendants' testimony that they take seriously grievances and other complaints about racial slurs. The named defendants, as individuals, do not condone the use of racial slurs. In their official capacities as members of the Department of Corrections, however, they consciously, voluntarily, and with reckless indifference to the rights of black inmates have failed to implement policies that would prevent this situation from occurring, and affirmatively encourage its continuation. Similarly, the vast majority of the correctional officers in the Department do not use racial slurs. It takes only a minority, however, to create an atmosphere of racial harassment.

In summary, defendants have adopted the kind of attitude toward this situation that supports a finding that the use of racial slurs towards black inmates exists as an official or unofficial policy or custom of the Department of Corrections. *Cf. Bohen,* 799 F.2d at 1189 (municipal liability existed where "[c]omplaints by the victims of sexual harassment were addressed superficially if at all, ... the department had no policy against sexual harassment[,] ... sexual harassment was the general, on-going, and accepted practice at the ... Department, and high-ranking, supervisory, and management officials responsible for working conditions at the department knew of, tolerated, and participated in the harassment"). I will give defendants sixty (60) days from the date of this opinion to submit a proposed solution to this problem. Plaintiffs will have thirty (30) days to respond to defendants' proposal.

■ The fourth racial discrimination claim is plaintiffs' contention that defendants intentionally segregate by race the dining room servers, the serving lines, and the eating areas. I find that the inmate dining lines (except at the central complex, where there is only one line) and the inmate eating areas generally are segregated by race. Defendants' photographs indicate that the dining lines and the eating areas occasionally are racially integrated. Defs. exhs. 344, 345, 347, 348, 366, 367, 370, & 371. The overwhelming weight of the testimony, however, from both defendants' witnesses and plaintiffs' witnesses, was

that the dining lines and the eating areas are segregated by race. *E.g.*, T at 2239–41; T at 2332–33; T at 3076; T at 2027–28; 3–17–87 T at 116; 3–17–87 T at 163. I find that the inmate serving lines occasionally are segregated by race. T at 2028; T at 3059–60; T at 3044. I also find that on rare occasions, individual staff members direct inmates to a particular line or area of the dining hall. T at 2367–68; T at 972. I do not find that this occurs on a regular, or even a frequent, basis, and I specifically do find that the correctional staff almost always allows inmates to choose which line they wish to enter. See T at 1931; T at 2121; T at 2178; T at 2277–78; T at 2350–52; T at 2375–77. I also do not find sufficient evidence in the record for me to conclude that defendants' staff assigns inmate servers to the serving line by race.

Plaintiffs posit three arguments in support of their claim. First, they argue that defendants historically have officially segregated their dining lines and eating areas. Secondly, they argue that defendants have the ability to desegregate the dining lines and the seating areas (either by establishing only one dining line or by requiring inmates to go into integrated lines) and to desegregate the serving lines (by assigning the servers to integrated lines). Thirdly, they argue that in a prison context, inmates cannot freely choose where to eat, sleep, or work. The Court has carefully considered plaintiffs' arguments and finds that it must reject them and enter judgment for the defendants on this issue.

I do not find that defendants historically have had officially segregated dining lines and eating areas. The only testimony on this issue came from the former Director of the Department of Corrections, Perry Johnson, who testified that "[d]uring the 1950s, the department ... practiced that kind of de facto segregation throughout the prison system, in which there was considerable segregation in housing and extensive segregation with respect to institutional assignments." 3–17–87 T at 41. Although this testimony supports an inference that defendants intentionally segregated the dining halls by race in the 1950s, the Court is not required to draw that

inference and there is no explicit testimony that any intentional discrimination that did exist in the dining halls in the 1950s lasted into the 1960s and the 1970s. See pls. exhs. 47 at 11 (noting that inmates integrate themselves in the dining rooms) & 48 at 21 (noting only the presence of racial segregation in the dining halls). Plaintiffs' historical evidence on this issue is remote, speculative, and not very persuasive, particularly given the rapid turnover of inmates in a prison system.

Secondly, although defendants may have the ability to desegregate the dining areas, they must do so only if their current actions violate the inmates' constitutional right to be free from racially discriminatory treatment. In this context, absent prior *de jure* segregation, an explicit acknowledgment of prior intentional *de facto* segregation, or a finding of present intentional segregation, defendants are not affirmatively obligated to eradicate the presently existing segregation in the dining halls. *See Thomas v. Pate*, 493 F.2d 151, 155 (7th Cir.1974), *cert. denied*, 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1975); *accord Bazemore v. Friday*, —— U.S. ——, ——, 106 S.Ct. 3000, 3016–17, 92 L.Ed.2d 315, 339–41 (1986) (Brennan, J., dissenting in part); *Green v. County School Board of New Kent County*, 391 U.S. 430, 437–38 (1968).

Finally, the Court finds little evidence to suggest that inmates do not voluntarily choose a dining line or an eating area. I recognize that often in a prison setting, "where hostility of every kind is rampant, freedom of choice is but a gauze for discrimination." *Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir.1981) (*en banc*), *cert dismissed sub nom., Ledbetter v. Jones*, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981). The dining hall situation in this case, however, is far different than the housing situation in *Jones*, where a newly admitted black inmate was given the "choice" of confinement in a "cell crowded with white prisoners, some convicted of major felonies," or a cell crowded with black prisoners. *Id.* I agree with plaintiffs that this situation also is different

than the 4–H and Homemaker Clubs issue the Supreme Court decided in *Bazemore* because in a prison setting inmates generally must go to the dining hall and prison officials have the authority to establish dining lines and eating areas. *Compare Bazemore,* —— U.S. at ——, ——, 106 S.Ct. at 3012–13, 92 L.Ed.2d at 335–36. Absent evidence, however, that defendants presently direct inmates into particular lines or eating areas, or otherwise affirmatively encourage segregation in the dining halls, the Court finds no basis for granting plaintiffs the relief they request.

■ Plaintiffs' final racial discrimination claim is that defendants intentionally discriminate against black inmates by assigning white inmates to the highest job levels and the most desirable jobs while assigning black inmates to the lowest job levels and the less prestigious jobs. In support of this claim, plaintiffs offered statistical evidence indicating that black inmates are disproportionately underrepresented in the most desirable jobs, *i.e.,* the industry and maintenance jobs; are disproportionately overrepresented in the least desirable jobs, in particular the kitchen assignments; and are disproportionately underrepresented in the highest job levels within each job category. They sought to prove that these disparities reflect intentionally discriminatory actions by the defendants and persons to whom they have delegated policy-making authority by introducing testimony and other evidence indicating that persons responsible for employment assignments have racially discriminatory attitudes and that black inmates have suffered from specific incidences of discrimination. For the following reasons, the Court concludes that plaintiffs have not satisfied their burden of proof on this issue.

The Court can make a number of factual findings from the evidence. Inmates in general tend to prefer jobs in the Michigan State Industries, in other kinds of industrial work, and in maintenance, and tend to dislike jobs in the kitchen. *See, e.g.,* T at 211–12; pls. exh. 7 at 79; pls. exh. 273 at 20; pls. exh. 48 at 20; pls. exh. 718 at 56 &

60. Furthermore, plaintiffs' statistics indicate that racial disparities exist in inmate employment, *i.e.,* the racial balance in some job categories is not proportional to the racial balance of the institution as a whole. These disparities exist in particular in the kitchen assignments at the subject institutions, where black inmates tend to be overrepresented, see pls. exhs. 521–C, 521–D, 521–E, 521–F, 521–I, & 521–K, and in the industry and maintenance assignments at the subject institutions, where black inmates tended to be underrepresented. See pls. exhs. 521–C, 521–D, 521–E, 521–F, 521–G, 521–H, 521–I, 521–J, & 521–K. In general, as Dr. Christensen concluded, in "the most desired jobs ... there is an under-percentage of non-whites" while in "the least desired jobs of kitchen, there is an over-percentage of non-whites." T at 223.

The statistics do not, however, show any overwhelming racial disparities in inmate employment. In addition, they demonstrate that on many occasions the disparity, if any, is insignificant. See pls. exhs. 521–C (1982—CC Kitchen & SC Factory & Maintenance); 521–D (1983—CC Factory & Maintenance, NC Kitchen, & SC Kitchen & Factory); 521–E (1984—CC Factory & Maintenance, NC Kitchen, Factory, & Maintenance, & SC Kitchen & Factory); 521–F (1985—CC Maintenance, NC Kitchen, Factory, & Maintenance, & SC Factory & Maintenance); 521–G (1984—MBP–I Kitchen, Factory, & Maintenance; 1983—MBP–I Kitchen & Maintenance; 1982—MBP–I Kitchen, Factory & Maintenance); 521–H (1985—MBP–I Kitchen); 521–I (1986—MBP–I Kitchen; MBP–T Kitchen, Factory, & Maintenance); 521–J (1984–MR Kitchen, Factory & Maintenance; 1983—MR Kitchen & Factory; 1982—MR Kitchen & Factory); & 521–K (1985—MR–Inside Factory). The general trends are as Dr. Christensen suggests, but the statistical evidence is not overwhelmingly persuasive, and in fact is much less persuasive than the statistical evidence on racial disparities in administrative segregation, punitive detention, and protective custody. I note in particular that the statistics for the MBP, pls. exhs. 521–G, 521–H, & 521–I, are not persuasive in light of plaintiffs' contention

that black inmates in this institution suffer the most from racially discriminatory treatment.

There also is evidence of racial disparities in pay levels within job categories. Again, the evidence suggests that blacks are underrepresented at the higher levels and overrepresented at the lower levels. Pls. exhs. 521–M, 521–N, 521–O, & 521–P. As with the other statistical evidence, however, these exhibits do not provide significantly persuasive support for plaintiffs' claim. There was credible testimony that on occasion black inmates are discriminatorily assigned to less desirable jobs, are discriminatorily passed over for promotions in favor of white inmates, and are not assigned employment for which they are well-qualified. See, e.g., T at 2002–03; T at 2858–59; T at 2916 (kitchen all black); T at 3074–75 (hard kitchen jobs handled by blacks; easy jobs handled by whites); T at 3022 (whites had clerical jobs); pls. exh. 436C (discussing plans to assign additional white inmates to industries even though blacks apparently were underrepresented and available); T at 2786–91 (passed over for set-up man in favor of whites); T at 2711–14 (passed over for jobs as ordering clerk and head clerk in favor of whites); T at 3160–65 & 3172 (promoted more slowly than white inmates); & T at 3001–05 (white inmates with less seniority received promotions first). I cannot find, however, that these instances of discriminatory treatment are widespread or represent a general pattern of treatment of black inmates. Some of the instances, for example, appeared to reflect simple mistakes or oversight on the part of correctional staff. E.g., id. at 3005–06 (white supervisor assisted witness in getting promotion to a seven position).

Plaintiffs presented credible testimony of racially biased attitudes on the part of some of the correctional staff involved in inmate employment. See pls. exh. 35 at 59–60 (classification director for the SPSM-CC and part of the NC indicated belief that blacks are afraid of electricity and should not be assigned to maintenance); T at 2687 (same person using racially derogatory remark); pls. exh. 712 (supervisor at SPSM Machine Shop called MDOC Director a "nigger"; did not realize the remark was offensive); pls. exh. 450 (assistant business manager given counselling memorandum for using racial slur); T at 1990 (civilian kitchen supervisor stated she did not "trust niggers"); T at 1452 (MBP librarian referred to law clerk as "her boy"); T at 2368–69 (custodial supervisor asked "nationality" of college trained black inmate who objected to custodial training assignment); & T at 1979 (MBP food service director stated "he didn't want any niggers working" in the clerk's position because "he couldn't trust them"). I do not, however, find that this bias is widespread, that black inmates regularly are denied desirable employment or higher level positions within a job category because of such bias, or that the Department either is aware of intentionally discriminatory job actions or implicitly or explicitly condones or encourages such actions. The Court does not agree that the legislative reports on the 1981 riots "describe [an] abundance of" racially stereotypic attitudes by staff who "hire prisoners for jobs and promote them on these jobs," see plaintiffs' Dec. 22, 1986 rule 41(b) brief at 15; that, in general, "staff supervising jobs in the subject institutions ... succumb to the attitude that Caucasian prisoners are more capable of functioning independently and supervising the work of prisoners within their departments," id. at 14; or that a significant "number of staff responsible for the assignment of prisoners to jobs and the promotion of prisoners within the job have racially demeaning attitudes towards people of color." Plaintiffs' Trial Brief at 8.

Certainly, and regrettably, incidents of intentional racial discrimination occur in inmate employment in the subject facilities. Defendants made no attempt to rebut plaintiffs' testimony on these incidents. In particular, the Court was shocked at the apparent attitude of the Director of Classification at the SPSM toward black inmates, as evinced by the deposition statement it cited previously. It does not find, however, that plaintiffs have linked such attitudes to a pattern, or even frequent incidents, of

racially discriminatory treatment of black inmates. The Court also was disturbed by plaintiffs' evidence on kitchen assignments. The statistical evidence shows that blacks are rather consistently overrepresented on such assignments at the SPSM, and there is a significant amount of testimony in the record indicating that within these assignments, black inmates are given the least desirable jobs. See T at 3021–23 (kitchen assignments at the central complex). Even in this area, however, the Court does not find that plaintiffs have produced sufficient evidence to establish that any intentional or purposeful discrimination that may occur constitutes a policy, practice, or custom of the Department of Corrections.

In accordance with the above findings of fact, I conclude that I must reject plaintiffs' claim of racial discrimination in inmate employment. I do not reject this claim because the Department has formulated some sound policies in this area or because the named defendants conclusorily testified that the policies are implemented. I reject it, rather, because plaintiffs have not established the necessary link between the acts of misconduct that occur and any policy, custom, or practice of the Department of Corrections. *See Rizzo,* 423 U.S. at 371, 96 S.Ct. at 604; *Hays,* 668 F.2d at 874. They have not, moreover, established that those supervisory staff who apparently do have racially discriminatory attitudes are responsible for the statistical disparities in black employment. They come the closest to this at the SPSM–CC. Even there, however, black inmate representation in employment is not consistently and drastically disproportionate to their representation in the inmate population, see pls. exhs. 521–C, 521–D, 521–E, & 521–F, and there is little other evidence of a pattern of intentionally discriminatory treatment by the Department of Corrections. *Compare Bohen,* 799 F.2d at 1189 (departmental liability established where "sexual harassment was the general, on-going, and accepted practice").

The Court in one sense has been somewhat reluctant in reaching the conclusions it has on plaintiffs' racial discrimination claims. I believe, of course, that they are required under the law and by the evidence presented at trial. I reiterate, however, that I was deeply disturbed by plaintiffs' evidence. Racial discrimination has been and is such a societal plague that I firmly believe every governmental entity is obligated, albeit not always constitutionally required, to expend every effort to eradicate it completely from public life. This moral and societal obligation extends in particular to the Michigan Department of Corrections, to which society has entrusted the care, treatment, and punishment of those who predominantly come from the politically, economically, and socially powerless sectors of our society, and which has almost complete and total control over its inmate population. I regret that the Department is not completely meeting that obligation.

In accordance with the above opinion, the Court will enter a Judgment and Order granting plaintiffs partial relief on their severed claims. With regard to the appealability of my Judgment and Order, despite my earlier request that the parties brief the issue of the application of Rule 54(b) certification, I agree with plaintiffs that 28 U.S.C. § 1292(a)(1) provides the proper guidance. For the sake of clarity, and recognizing that the Sixth Circuit may well disagree on whether they are immediately appealable, the Court will indicate its intent as to its decisions. I intend my decisions on the following claims for relief, granting or denying injunctive relief, to be final: (1) the lack of adequate winter clothing; (2) the lack of adequate access to toilet and lavatory facilities at the RPC; and (3) racial discrimination, except for the racial slurs claim. I intend for my decisions on the remaining substantive claims for relief to become final grants of injunctive relief when I order defendants to implement appropriate remedial plans. *See Groseclose v. Dutton,* 788 F.2d 356 (6th Cir.1986).

## JUDGMENT AND ORDER

In accordance with the opinion dated August 10, 1987;

IT IS HEREBY ORDERED that plaintiffs' request for relief concerning defend-

ants' system of handling incoming legal mail is GRANTED and that JUDGMENT is entered FOR plaintiffs and AGAINST defendants on this issue; defendants shall have sixty (60) days from the date of this opinion to submit a revised system for allowing inmates to invoke their constitutional right to be present when their clearly marked legal mail is opened and inspected for contraband;

IT IS FURTHER ORDERED that JUDGMENT is entered FOR plaintiffs and AGAINST defendants on plaintiffs' claim that they are denied adequate winter clothing in violation of the Eighth Amendment; defendants are hereby ENJOINED to provide inmates with constitutionally adequate winter coats, hats, gloves, and, under the circumstances specified in the opinion, boots;

IT IS FURTHER ORDERED that JUDGMENT is entered FOR plaintiffs and AGAINST defendants on plaintiffs' claim that inmates at the Riverside Correctional Facility are denied adequate access to toilet and lavatory facilities in violation of the Eighth Amendment; defendants shall have sixty (60) days from the date of this opinion to submit a plan for remedying the constitutional deficiencies that exist at the RCF;

IT IS FURTHER ORDERED that JUDGMENT is entered FOR defendants and AGAINST plaintiffs on plaintiffs' claim that inmates at the Riverside Psychiatric Center are denied adequate access to toilet and lavatory facilities in violation of the Eighth Amendment;

IT IS FURTHER ORDERED that JUDGMENT is entered FOR plaintiffs and AGAINST defendants on plaintiffs' claim that inmates at the subject facilities are denied their fundamental constitutional right of access to the courts; defendants shall have sixty (60) days from the date of this opinion to submit a plan to remedy the constitutional defects in their current system of providing inmates with access to the courts;

IT IS FURTHER ORDERED that JUDGMENT is entered FOR defendants and AGAINST plaintiffs on plaintiffs' claim that black inmates at the subject facilities are, as a class, subjected to intentional racial discrimination in violation of the equal protection clause of the Fourteenth Amendment; JUDGMENT, however, is entered FOR plaintiffs and AGAINST defendants on plaintiffs' claim that they are subjected to racial harassment in the form of racial slurs; defendants shall have sixty (60) days from the date of this opinion to submit a proposed solution for this violation;

IT IS FURTHER ORDERED that defendants' April 23, 1987 Request for Judicial Notice is DENIED;

IT IS FURTHER ORDERED that defendants' May 7, 1987 Motion to Strike Testimony of Ronald Christensen is DENIED;

IT IS FURTHER ORDERED that defendants' oral motion to decertify the plaintiff class on the racial discrimination issue is GRANTED in part and DENIED in part; the class is decertified and no judgment is rendered for either party on the issue of the constitutional validity of defendants' anti-discrimination in inmate employment policy.